# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CHARLES ALMOND AS TRUSTEE )
FOR THE ALMOND FAMILY 2001 )
TRUST, ALMOND INVESTMENT )
FUND LLC, CHARLES ALMOND, and )
ANDREW FRANKLIN, )
)
       Plaintiffs, )
)
   v. )     C.A. No. 10477-CB
)
GLENHILL ADVISORS LLC, )
GLENHILL CAPITAL LP, GLENHILL )
CAPITAL MANAGEMENT LLC, )
GLENHILL CONCENTRATED LONG )
MASTER FUND LLC, GLENHILL )
SPECIAL OPPORTUNITIES MASTER )
FUND LLC, JOHN EDELMAN, )
GLENN KREVLIN, JOHN MCPHEE, )
WILLIAM SWEEDLER,WINDSONG )
DB DWR II, LLC, WINDSONG DWR, )
LLC, WINDSONG BRANDS, LLC, )
HERMAN MILLER, INC. and HM )
CATALYST, INC., )
)
      Defendants, )
)
   and )
)
DESIGN WITHIN REACH, INC., )
)
      Intervenor and )
      Counterclaim-Petitioner. )

## MEMORANDUM OPINION

Date Submitted: May 31, 2018
Date Decided: August 17, 2018

Peter B. Ladig of BAYARD, P.A., Wilmington, Delaware; David H. Wollmuth and Michael C. Ledley of WOLLMUTH MAHER & DEUTSCH LLP, New York, New York. *Attorneys for Plaintiffs Charles Almond as Trustee for the Almond Family 2001 Trust, Almond Investment Fund LLC, and Charles Almond.*

Norman M. Monhait and P. Bradford deLeeuw of ROSENTHAL MONHAIT & GODDESS, P.A., Wilmington, Delaware; Scott J. Watnik of WILK AUSLANDER LLP, New York, New York; Thomas A. Brown of MOREA SCHWARTZ BRADHAM FRIEDMAN & BROWN LLP, New York, New York. *Attorneys for Plaintiff Andrew Franklin.*

Andrew D. Cordo and F. Troupe Mickler IV of ASHBY & GEDDES, Wilmington, Delaware; Adrienne M. Ward and Brian Katz of OLSHAN FROME WOLOSKY LLP, New York, New York; John B. Horgan of ELLENOFF GROSSMAN & SCHOLE LLP, New York, New York. *Attorneys for Glenhill Advisors LLC, Glenhill Capital LP, Glenhill Capital Management LLC, Glenhill Concentrated Long Master Fund LLC, Glenhill Special Opportunities Master Fund LLC, Glenn Krevlin, William Sweedler, Windsong DB DWR II, LLC, and Windsong DWR LLC.*

Douglas D. Herrmann of PEPPER HAMILTON LLP, Wilmington, Delaware; Paul B. Carberry, Joshua Weedman, and Erin Smith of WHITE & CASE LLP, New York, New York. *Attorneys for John Edelman and John McPhee.*

Frederick B. Rosner, Scott J. Leonhardt, and Jason A. Gibson of THE ROSNER LAW GROUP LLC, Wilmington, Delaware; S. Preston Ricardo of Golenbock Eiseman Assor Bell & Peskoe LLP, New York, New York. *Attorneys for Windsong Brands, LLC.*

John D. Hendershot, Susan M. Hannigan, and Brian F. Morris of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Bryan B. House of FOLEY & LARDNER LLP, Milwaukee, Wisconsin. *Attorneys for Defendants, Counterclaim Petitioners Herman Miller Inc. and HM Catalyst, and Intervenor and Counterclaim Petitioner Design Within Reach, Inc.*


**BOUCHARD, C.**

In July 2014, Herman Miller, Inc. acquired Design Within Reach, Inc. ("DWR" or the "Company"), a retailer of modern furniture, for approximately $170 million in a third-party merger transaction. The merger was the culmination of a dramatic turnaround of the Company that began in August 2009, when a group of funds known as Glenhill invested $15 million in the Company and became its controlling stockholder, holding a 92.8% equity interest. A new management team was put in place later that year, and the Company's fortunes improved steadily over the next few years.

After the merger closed, two former stockholders filed suit against Glenhill and the Company's directors who oversaw its turnaround. Plaintiffs have never challenged the fairness of the merger consideration, which by all accounts was an outstanding result. Instead, plaintiffs' core strategy has been to secure a larger portion of the merger consideration for themselves by challenging transactions that occurred before the merger.

In this post-trial decision, the court enters judgment in defendants' favor on all of plaintiffs' twelve claims for relief. Two rulings concerning two different categories of claims largely drive this result.

The first category consists of claims relating to a 50-to-1 reverse stock split that the Company implemented in 2010 on both its common stock and its Series A preferred stock, which Glenhill had purchased in 2009. Unknown to anyone at the

1

time, the reverse stock splits were implemented in a defective manner that had the effect of diluting the number of shares of common stock into which the Series A preferred stock could be converted by a factor of 2500-to-1, instead of the intended result of a 50-to-1 adjustment. This defect remained unknown in 2013, when the Series A preferred stock was converted into common stock, and in 2014, when the merger occurred.

Over one year after the merger closed, plaintiffs amended their complaint after discovering the defect, adding Herman Miller as a party and asserting that the merger was void. This action prompted Herman Miller to ratify certain defective corporate acts under 8 *Del. C.* § 204 relating to the implementation of the reverse stock splits and the subsequent conversion of the Series A preferred stock, and to file a counterclaim asking the court to validate those acts under 8 *Del. C.* § 205. For the reasons explained below, all of the equitable considerations identified in Section 205 overwhelmingly favor judicial validation, which the court grants.

The second category consists of claims challenging various transactions through which some or all of the Company's board members or their affiliates received additional equity in the Company before the merger. All of these claims are concededly derivative in nature and, thus, a threshold issue is whether plaintiffs' standing to maintain these claims was extinguished as a result of the merger.

2

Plaintiffs advance a novel "control group" argument in an effort to fit these claims into the transactional paradigm our Supreme Court recognized in *Gentile v. Rosette* for "a species of corporate overpayment claim" that can be both derivative and direct when a transaction results in an improper transfer of economic value and voting power from the minority stockholders to the controlling stockholder.[1] That argument fails, however, because it is clear from the record that Glenhill was DWR's controlling stockholder by itself (and not as part of the group plaintiffs suggest) at all relevant times and that each of the challenged transactions did not increase—but actually reduced—its economic stake and voting power in the Company.

Based on these two rulings, and for other reasons explained below with respect to plaintiffs' remaining claims, judgment will be entered in defendants' favor and against plaintiffs on all claims.

## I. BACKGROUND

The facts recited in this opinion are my findings based on the testimony and documentary evidence submitted during a five-day trial held in November 2017. The record includes stipulations of fact in the Pre-Trial Stipulation and Order ("PTO"), over 500 trial exhibits, nine depositions, and the live testimony of eight fact and two expert witnesses.

---

[1] 906 A.2d 91, 99 (Del. 2006).

**A. The Parties and Relevant Non-Parties**

Design Within Reach, Inc. is a Delaware corporation with its principal place of business in Stamford, Connecticut. It is in the business of selling modern design furnishings and accessories.[2] DWR was the surviving corporation of a merger with defendant HM Catalyst, Inc., a wholly-owned indirect subsidiary of defendant Herman Miller, Inc., that closed on July 28, 2014 (the "Merger").[3] Herman Miller is a Delaware corporation with its principal place of business in Zeeland, Michigan that produces office furniture, equipment, and home furnishings.[4]

Plaintiffs were stockholders of DWR at the time of the Merger. Plaintiff Charles Almond, individually or through the Almond Investment Fund, LLC and the Almond Family 2001 Trust, owned approximately 9.6% of DWR common stock in August 2009, and continued to acquire additional DWR shares until July 2014.[5] The Almond plaintiffs tendered their shares for the Merger consideration on August 21, 2014.[6] Plaintiff Andrew Franklin owned DWR common stock in 2009 and sold

---

[2] PTO ¶ 1.

[3] PTO ¶¶ 3, 63.

[4] PTO ¶ 2.

[5] PTO ¶ 11.

[6] PTO ¶ 11.

approximately 25% of his shares after the Merger was consummated.[7]  On August 25, 2014, Franklin tendered his remaining shares for the Merger consideration.[8]

Defendants Glenhill Advisors, LLC, Glenhill Capital, L.P., Glenhill Capital Management, LLC, Glenhill Concentrated Long Master Fund, LLC (the "Glenhill Long Fund"), and Glenhill Special Opportunities Master Fund LLC (collectively, the "Glenhill Defendants") are part of a fund complex managed by defendant Glenn Krevlin.[9]  Non-party Glenhill Capital Overseas Master Fund, L.P. (the "Glenhill Overseas Fund") is a limited partnership that primarily invests in equity markets and has an investor base of institutional investors, pension plans, foundations, individuals, and family offices.[10]  The Glenhill Defendants and the Glenhill Overseas Fund are referred to collectively as "Glenhill."

At all relevant times, Krevlin had sole investment and voting power over all DWR shares held by Glenhill.[11]  Krevlin also was the largest investor in and the sole portfolio decision maker at all relevant times for the Glenhill Long Fund, which was an investment vehicle primarily for individuals.[12]

---

[7] PTO ¶ 12.

[8] PTO ¶ 12.

[9] PTO ¶ 4; Tr. 9 (Krevlin).

[10] Tr. 8 (Krevlin); Dkt. 377.

[11] PTO ¶ 6.

[12] Tr. 9, 104-106 (Krevlin).

Defendant Windsong Brands, LLC ("Windsong Brands") is an investment and restructuring company.[13]   Defendant William Sweedler was the managing member of Windsong Brands at all relevant times.

The individual defendants are Krevlin, Sweedler, John Edelman, and John McPhee.  From January 2010 until the Merger, the period relevant to plaintiffs' claims, the Company's board of directors (the "Board") consisted of these four individuals (collectively, the "Director Defendants"), with Krevlin serving as Chairman of the Board.[14]   Krevlin and Sweedler joined the Board in 2009.[15] Edelman and McPhee joined the Board in January 2010, when they were hired to serve as the Company's CEO and COO, respectively.[16]

Defendants Windsong DWR, LLC ("Windsong I") and Windsong DB DWR II, LLC ("Windsong II") are special purpose vehicles that were formed in May 2010 and July 2012, respectively, for the purpose of investing in DWR.[17]

---

[13] PTO ¶ 7.

[14] PTO ¶ 10.

[15] PTO ¶ 18.

[16] PTO ¶ 9.

[17] PTO ¶ 8.

## B. Events Preceding the 2009 Transaction

In 2004, DWR went public and listed its common stock on NASDAQ.[18] From 2005 to 2007, the Company's revenues grew, but it continued to operate at a loss.[19] On February 2, 2007, the Company entered into a Loan Guaranty and Security Agreement with Wells Fargo Retail Finance, LLC that provided the Company with a revolving credit line that was secured by substantially all of the Company's assets, except for certain intellectual property.[20] In 2008, with the collapse of the housing market, DWR's revenues dropped by $15 million, and the Company incurred $14.6 million in losses.[21]

In May 2009, Wells Fargo informed the Company that it needed to make a capital infusion of $10 million to $15 million to maintain its line of credit.[22] On May 29, 2009, DWR sought a financial viability exception from NASDAQ to allow a contemplated transaction to close without stockholder approval.[23] After NASDAQ denied that request, DWR delisted its stock from NASDAQ effective July 16, 2009.[24] It is in this context that a special committee of the Board pursued a private

---

[18] PTO ¶ 1.

[19] PTO ¶ 1.

[20] PTO ¶ 21; JX 2 at 2.

[21] PTO ¶ 1.

[22] JX 10; JX 529 at 40.

[23] PTO ¶ 14.

[24] PTO ¶¶ 14-15.

placement with Glenhill, which held approximately 2.5 million shares or 17.2% of the Company's common stock and had no Board representation at the time.[25]

## C. The 2009 Transaction

On July 20, 2009, DWR and Glenhill entered into a Securities Purchase Agreement pursuant to which Glenhill[26] acquired a 91.33% ownership stake in DWR for $15 million in the form of 15.4 million shares of DWR common stock for $0.15 per share and 1 million shares of Series A 9% Convertible Preferred Stock (the "Series A Preferred") for $12.69 per share (the "2009 Transaction").[27] The 2009 Transaction closed on August 3, 2009, at which point Glenhill became the Company's majority stockholder with a total equity ownership interest of 92.8%, including the shares it held before the 2009 Transaction.[28] The 2009 Transaction is not the subject of any challenge in this action.

---

[25] PTO ¶ 4.

[26] Glenhill Special Opportunities Master Fund LLC was the counterparty to the Securities Purchase Agreement, but the purchased shares were issued to the Glenhill Long Fund (8.34%), Glenhill Capital LP (51.33%), and the Glenhill Overseas Fund (40.33%), which were the three owners of the Glenhill Special Opportunities Master Fund LLC. Dkt. 377; JX 22 at GH/WS 0000204.

[27] PTO ¶¶ 16, 18; JX 22 at GH/WS 0000038-74; JX 111 at DWR_EM_0000481. The Pre-Trial Order states that the Series A Preferred was issued at $12.89 per share (PTO ¶ 18), but this appears to be a typographical error. The Securities Purchase Agreement states that the Series A Preferred was issued at $12.69 per share, which is its "Stated Value." JX 22 at GH/WS 0000038; JX 23 § 2.

[28] PTO ¶ 5; JX 111 at DWR_EM_0000455; JX 513 ¶ 24.

8

The terms of the Series A Preferred were governed by the Certificate of Designation of Preferences, Rights and Limitations of Series A 9% Convertible Preferred Stock of Design Within Reach, Inc. (the "Series A COD").[29] Four features of the Series A Preferred relevant to this case are its (i) voting rights; (ii) paid-in-kind dividend; (iii) conversion formula; and (iv) adjustment provision.

**Voting Rights.** The Series A Preferred shares (i) had voting rights equal to the number of shares of common stock into which the Series A Preferred could convert, on an "as-converted" basis; and (ii) voted together with the common stock as one class on all matters.[30]

**PIK Dividend**. Series A Preferred holders had the right to receive cumulative dividends at the rate of 9% per year, compounding annually to be paid-in-kind in the form of additional shares of Series A Preferred (the "PIK Dividend"), with the option to let the PIK Dividend (i) accrue to the next "Dividend Payment Date" or (ii) to accrete to and increase the Stated Value:

> Holders shall be entitled to receive, and the Corporation shall pay, cumulative dividends at the rate per share (as a percentage of the Stated Value per share) of 9.0% per annum (compounding annually . . .), payable annually in arrears, beginning on the first such date after the Original Issue Date and on each Conversion Date . . . in duly authorized, validly issued, fully paid and non-assessable shares of Preferred Stock (the "Dividend Share Amount"). At the option of the Holder, such

---

[29] PTO ¶ 18; JX 23.

[30] JX 23 § 4.

9

dividends shall accrue to the next Dividend Payment Date or shall be accreted to, and increase, the outstanding Stated Value.[31]

**Conversion Formula**. Series A Preferred holders had the right to convert their shares into shares of common stock in certain specified circumstances. Upon conversion, the holder was entitled to receive a number of common shares determined by multiplying the number of Series A Preferred shares to be converted by a "Stated Value" and then dividing by a "Conversion Price" (the "Conversion Formula").[32] The initial Stated Value was $12.69, and the Conversion Price was $0.09235.[33] To "effect conversions," a Series A Preferred holder had to provide the Company with a completed "Notice of Conversion" in the form attached as "Annex A" to the Series A COD.[34]

**Adjustment Provision**. Section 7 of the Series A COD contains a number of terms to adjust the Conversion Formula for the Series A Preferred in the event of certain types of transactions, such as stock dividends, stock splits, and subsequent equity sales of common stock.[35] Relevant here, Section 7(a) adjusted the Conversion

---

[31] JX 23 § 3(a); *see also* JX 14 at GH/WS 0000103.

[32] JX 23 § 6(a).

[33] JX 23 §§ 2, 6(b).

[34] JX 23 § 6(a).

[35] JX 23 § 7.

Price of the Series A Preferred in the event of a reverse split of the common stock as

follows:

> If the Corporation, at any time while this Preferred Stock is outstanding: . . . (iii) combines (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares . . . then the Conversion Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock . . . outstanding immediately before such event, and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event.[36]

In simple terms, under Section 7(a), a reverse split of the common stock would

increase the Conversion Price of the Series A Preferred, which, in turn, would

decrease in a proportional manner the number of common shares into which a share

of Series A Preferred was convertible through operation of the Conversion Formula.

As such, the provision was intended to operate so that, all else being equal, a Series

A Preferred holder would receive the equivalent economic benefit upon a conversion

of the Series A Preferred after a reverse split of common stock as it would have

received upon a conversion before the split.

To be clear, the preceding discussion concerns how a reverse split *of the

common stock* affects the Series A Preferred. As becomes important in this case, the

Series A COD did not provide for any adjustment to the Conversion Formula for the

Series A Preferred in the event of a reverse split *of the Series A Preferred itself*.

---

[36] JX 23 § 7(a).

11

## D. The Brands Grant

As part of the 2009 Transaction, the Company agreed that Glenhill would have three Board designees. Glenhill initially designated Krevlin, Sweedler, and David Rockwell, who joined then-CEO Ray Brunner and Peter Lynch.[37]

The new Board met on August 20, 2009.[38] After the meeting, DWR's CFO Ted Upland raised concerns that the business plan Brunner introduced did not include "the real numbers."[39] According to Stuart Jamieson of Windsong Brands, the projections were "really unrealistic."[40] At the Board's request, Windsong Brands put together a team to investigate, sending Jamieson, Ken Ragland, and Sweedler to DWR's headquarters in San Francisco.[41] In late August 2009, after discovering that Brunner had engaged in misconduct, Jamieson and Ragland "walked [Brunner] out of the building" and "took over" the Company, with Jamieson as acting CEO.[42] On October 16, 2009, the Board terminated Brunner from his CEO position for cause based on various alleged acts of misconduct.[43]

---

[37] PTO ¶ 18; JX 27 at 1.

[38] JX 27 at 1.

[39] Tr. 25-26 (Krevlin).

[40] Tr. 688-89 (Jamieson).

[41] Tr. 689-90 (Jamieson).

[42] Tr. 692-93 (Jamieson).

[43] *See* JX 47 at GH_WS0045704-5.

12

From late August 2009 until early 2010, Windsong Brands acted as interim management, performing a top-to-bottom review of DWR's business and evaluating how to "cut the costs as much as possible," given that the Company was losing $1 million to $2 million per month.[44] Windsong Brands oversaw a reduction of 20% to 30% of DWR's staff and the implementation of other cost-cutting measures to "stop[] the bleeding," including changing the Company's medical plan for employees and shutting down the development of new products.[45] On October 16, 2009, the Company terminated the registration of its common stock to save the expense of maintaining public company filings.[46] By the end of 2009, Windsong Brands had reduced the Company's expense structure by 20% or approximately $11.4 million,[47] but the Company's pre-tax losses still increased to $24.9 million.[48] At some point after Brunner was terminated as CEO in October 2009, the Board considered filing for bankruptcy.[49]

Before performing its restructuring and consulting work, Windsong Brands did not reach an agreement with the Company on compensation.[50] In early 2010,

---

[44] Tr. 691-96 (Jamieson); Tr. 919-20 (Sweedler); *see also* JX 28.

[45] Tr. 693-95 (Jamieson).

[46] PTO ¶ 19; Tr. 31 (Krevlin).

[47] JX 99 at GH_WS0040041-42.

[48] JX 99 at GH_WS0040038.

[49] Tr. 113 (Krevlin); *see also* Tr. 576-78 (McPhee); Tr. 873-74 (Sweedler).

[50] Tr. 29-30 (Krevlin); Tr. 865-66 (Sweedler).

Sweedler began compensation negotiations with Krevlin, seeking a 10% equity interest in the Company, which he believed was "commonplace" for this type of work.[51] After a "long, drawn-out negotiation," Sweedler ultimately agreed to accept a 1.5% interest in the Company.[52]

On September 28, 2011, the Company granted 54,796 shares of restricted stock to Windsong Brands that would vest only if a change of control occurred before March 22, 2016 (the "Brands Grant").[53] The stock grant provided that "Windsong shall have all rights of a stockholder (including, without limitation, the right to receive all dividends and distributions and voting rights) with respect to the shares of Common Stock comprising the Award."[54] The stock grant did not state that Windsong Brands would receive anti-dilution protection.

## E. DWR Hires Edelman and McPhee

In the fall of 2009, Sweedler introduced Krevlin to Edelman and McPhee, who had recently sold their business to one of DWR's competitors.[55] Edelman and McPhee had worked together successfully in other ventures and were "a package

---

[51] Tr. 866-69 (Sweedler); Tr. 698-99 (Jamieson).

[52] Tr. 866-68 (Sweedler); JX 79; JX 89.

[53] JX 180 at GH_WS0013913.

[54] JX 180 at GH_WS0013913.

[55] Tr. 33 (Krevlin); Tr. 443-44 (Edelman).

14

deal," with McPhee focused on operations and Edelman focused on sales and design.[56]

On December 14, 2009, the Company entered into employment agreements with Edelman and McPhee, hiring them to serve as CEO and COO, respectively, beginning in January 2010.[57]  Those agreements provided Edelman and McPhee options to purchase 4% and 3% of the Company's equity, respectively.[58]  The agreements did not state that Edelman or McPhee would receive anti-dilution protection.  In January 2010, Edelman and McPhee joined Krevlin and Sweedler on the Company's Board.[59]  These four individuals comprised DWR's entire Board from this point in time until the Merger.

### F.    The Windsong Note

In 2010, DWR was "continuing to not do well."[60]  By the end of the first quarter of 2010, net product revenues were down 23.6% from the year before, first

---

[56] Tr. 34 (Krevlin).

[57] PTO ¶¶ 9, 20.

[58] JX 49 at DWR_EM_0001471 (Edelman), 85 (McPhee).

[59] PTO ¶ 9.  By this date, Brunner, Rockwell, and Lynch all had left the Board.  *See* Tr. 32-33 (Krevlin).

[60] Tr. 44 (Krevlin).

quarter income was negative, and EBITDA was lower than the year before.[61]   The

Company was "losing about [$]1 to $2 million a month, and [was] out of money."[62]

Shortly after McPhee and Edelman joined the Company in January 2010, the

Board began to consider a capital raise.[63]  On February 12, 2010, Krevlin emailed

Edelman: "Would be great to raise only 5mil[.] Sounds like we can round that up

[b]etween you john and friends."[64]  That month, Edelman contacted four potential

investors: "one of [his] relationships," his co-investor in another project, his brother,

and another contact, but "didn't really go through [the investment with them] at

length."[65]  Sweedler testified that he had discussions with a potential Canadian

investor (Knightsbridge Capital), but it wanted terms that were more dilutive than

the 2009 Transaction and a higher interest rate.[66]

On March 11, 2010, Seth Shapiro, a senior analyst at Glenhill,[67] emailed

Krevlin that the Company was "[n]ot in a real rush" to raise capital, "given [Edelman

and McPhee] cant close until early April and we don't have cash need before then."[68]

---

[61] Tr. 192-94 (Shapiro); JX 95; *see also* JX 556 at 9.

[62] Tr. 44 (Krevlin).

[63] Tr. 117-18 (Krevlin).

[64] JX 63.

[65] Tr. 465-67 (Edelman); JX 64 at GH_WS0038397.

[66] Tr. 876 (Sweedler).

[67] Tr. 186 (Shapiro).

[68] JX 78 at GH_WS0038948.

According to Krevlin, the Board did not seek funding from other potential investors because "it would be extremely difficult to get anyone comfortable with [the Company's] precarious situation,"[69] given the "significant unknown liabilities" in buying out leases for closed and underperforming stores[70] and a potential multi-million-dollar liability arising from "wage and hour" claims regarding the classification of sales associates as exempt employees to avoid paying overtime wages.[71]

The capital raise ultimately took the form of a $5 million loan referred to herein as the "Windsong Note." The terms of the Windsong Note were the product of a conflicted and deficient process. Shapiro was charged with "negotiating" the transaction on behalf of the Company even though his employer (Glenhill) was to own part of the Windsong Note.[72] Across from Shapiro sat Sweedler, who

---

[69] Tr. 46-47 (Krevlin).

[70] *See* JX 99 at GH_WS0040046 (noting that twenty-three studios were deemed impaired "due to the inability of those studios to demonstrate that they could generate future cash flows in excess of operating expenses"); Tr. 573-74, 578-79 (McPhee).

[71] *See* Tr. 44 (Krevlin); Tr. 582-85 (McPhee); *see also* JX 512 ¶ 53. By April 1, 2010, the Company resolved the wage and hour problem by changing its compensation plan, but it still was exposed to possible litigation given that employees could pursue claims that had statutes of limitations ranging from three to six years. Tr. 583-84 (McPhee).

[71] Tr. 576-78 (McPhee); *see also* Tr. 873-74 (Sweedler).

[72] Tr. 199 (Shapiro); *see* JX 109 (May 18, 2010 email from Sweedler to Krevlin, among others, stating "Glenn, you should know that [Shapiro] fought for EVERY little point for Glenhill!! He did his job AND MORE!!").

17

negotiated on behalf of himself, Jamieson, McPhee, Edelman, and (purportedly) the Glenhill Long Fund.[73] The Board did not consult with an outside financial advisor.[74]

Sweedler dictated the terms of the transaction. The loan was secured by a first lien on the Company's intellectual property, which was the usual structure Windsong Brands used to make investments,[75] and his lawyers (White & Case) papered the transaction.[76] Ellenoff Grossman & Schole LLP, the law firm that represented Glenhill and the Company, did not participate in any discussions about the legal or economic terms of the Windsong Note.[77] Joshua Englard, an Ellenoff Grossman partner, testified that he played no role in negotiating the terms of the Windsong Note, and that the transaction documents were presented to him as a "done document."[78]

There were no real price negotiations. The Windsong Note was priced "at the same price as the previous round," *i.e.*, on the same terms as Glenhill's initial investment.[79] That is, the Windsong Note "was convertible into common stock at the same exchange ratio as the [2009 Transaction] ($4.57 per share on a split-

---

[73] Tr. 199, 292-93 (Shapiro).

[74] Tr. 287 (Shapiro).

[75] Tr. 721-22 (Jamieson); PTO ¶ 23.

[76] *See* JX 66; Tr. 114 (Krevlin); *see also* Tr. 124-25 (Krevlin); Tr. 580 (McPhee).

[77] *See* Tr. 292 (Shapiro).

[78] JX 495 60-62 (Englard Dep.).

[79] *See* JX 552 at Defs.' Demonstrative 1; Tr. 53 (Krevlin).

adjusted basis) if converted immediately."[80]  As Krevlin testified, "the way this note was set up is that, basically, the conversion would be always tied to the same price of the conversion of the original '09 security so that they would move in lockstep in terms of the convertible price."[81]

Windsong I, a limited liability company, was formed for the purpose of making the $5 million loan reflected in the Windsong Note, which paid interest at a rate of 5% per year, had a maturity date of October 3, 2012, and contained an option to convert all of the principal and accrued interest into DWR common stock based on a conversion matrix.[82]  With respect to the 5% cash coupon, Krevlin testified that the original ask was closer to 10%, but the record does not contain any documentary evidence showing that the parties actually negotiated the coupon rate.[83]

The five members of Windsong I and their capital contributions were as follows: (i) Edelman—$2 million for 40%; (ii) Windsong DB, LLC (an entity associated with Sweedler)[84]—$1.15 million for 23%; (iii) the Glenhill Long Fund— $1 million for 20%; (iv) McPhee—$750,000 for 15%; and (v) Jamieson Investments,

---

[80] JX 512 ¶ 54.

[81] Tr. 53 (Krevlin).

[82] JX 105 at SJ_SBPN_0000666; § 5(a).  "The conversion matrix resulted in a conversion price that decreased over time," but "the longer the Windsong Note was outstanding, the greater the number of shares into which the Windsong Note would convert."  JX 513 ¶ 32.

[83] Tr. 53 (Krevlin).

[84] See JX 107 at GH_WS0036454 (reflecting that Sweedler is the authorized signatory of Windsong DB, LLC).

LLC (owned by Jamieson)—$100,000 for 2%.[85]    The limited liability company agreement for Windsong I, dated May 18, 2010 (the "LLC Agreement"), provided that any proceeds from the Windsong Note would be distributed to the members in proportion to their percentage ownership of Windsong I.[86]

The Company and Windsong I entered into a Note Purchase and Security Agreement dated as of May 18, 2010.[87]   The parties agreed that the Company would adjust the exercise price of the Windsong Note to account for any reverse stock split:

> If the Company, at any time while this Note is outstanding . . . combines (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares . . . then the Conversion Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock . . . outstanding immediately before such event, and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event.[88]

On May 24, 2010, the Company issued a Notice of Annual Meeting of Stockholders, which disclosed that the Company had entered into the Note Purchase and Security Agreement and that Sweedler, Krevlin, Edelman, and McPhee were "affiliated with" Windsong I.[89]

---

[85] JX 107 at § 3.3, GH_WS0036456.

[86] JX 107 §§ 6.1, 6.2.

[87] PTO ¶ 22; JX 108.

[88] JX 105 at § 6(a); *see also* JX 108 at GH_WS0036630.

[89] PTO ¶ 25; JX 111 at DWR_EM_0000484.

## G. The Reverse Stock Splits

During the summer of 2010, DWR common stock "became like a penny stock," trading intermittently and at widely fluctuating prices.[90] To address this volatility and save costs, the Board decided to implement a 50-to-1 reverse stock split of *both* the common stock and the Series A Preferred.[91] Specifically, on July 26, 2010, the Board recommended and Glenhill, as the Company's majority stockholder, approved (i) a 50-to-1 reverse stock split of the Company's common stock; (ii) a 50-to-1 reverse stock split of the Series A Preferred; and (iii) an amendment to the Company's certificate of incorporation to reduce the authorized number of shares of common stock from 30 million to 600,000 and the authorized number of shares of Series A Preferred from 1.5 million to 30,000 (the "Reverse Stock Splits").[92] After the Reverse Stock Splits were approved, Krevlin asked Shapiro to work with the Company's attorneys to effectuate the transaction.[93]

On August 23, 2010, the Company filed with the Delaware Secretary of State an amendment to its certificate of incorporation stating that the Company was authorized to issue 600,000 shares of common stock and 30,000 shares of preferred

---

[90] Tr. 59-60 (Krevlin); Tr. 586-87 (McPhee).

[91] Tr. 59-61 (Krevlin); Tr. 586-87 (McPhee).

[92] JX 126; PTO ¶ 28.

[93] Tr. 61, 132 (Krevlin); Tr. 211 (Shapiro).

21

stock.[94]  On or about August 27, 2010, DWR issued a press release announcing the Reverse Stock Splits, and the Company's stock transfer agent sent a notice to the Company's stockholders of record.[95]

As discussed later in this opinion, although unknown to anyone at the time, there were many flaws in the implementation of the Reverse Stock Splits.  Most importantly, instead of reducing by a factor of 50-to-1 the number of shares of common stock into which the Series A Preferred could convert, the transaction mistakenly was structured to reduce by a factor of 2500-to-1 the number of shares of common stock into which the Series A Preferred could convert.  I refer to this defect as the "double dilution" problem.

The prospect of double dilution of the Series A Preferred upon conversion arose because of the combined effect of two actions: (i) the 50-to-1 reverse split *of the common stock* triggered a 50-to-1 reduction in the number of shares of common stock into which each share of Series A Preferred could convert under the adjustment provision in Section 7(a) of the Series A COD, described above; and (ii) the 50-to-1 reverse split *of the Series A Preferred itself* reduced by 98% the number of shares of Series A Preferred outstanding.  With respect to the latter action, as mentioned previously, the Series A COD did not provide for any adjustment to the Conversion

---

[94] PTO ¶ 29; JX 118 at DWR_EM_0000104-5.

[95] PTO ¶ 30.

Formula for the Series A Preferred in the event of a reverse split of the Series A Preferred itself.

### H. The 2011 Bridge Loan and Herman Miller's Indication of Interest

In 2010, DWR closed nineteen stores, negotiated early terminations for five more leases,[96] and reported losses of $15.8 million and EBITDA of negative $3.1 million.[97] In 2011, the Company found itself with a large inventory of unsold outdoor product and needed an additional capital infusion until that excess inventory could be sold.[98] McPhee and Edelman asked Glenhill to make a bridge loan to the Company "to help [it] get over this problem."[99] On July 21, 2011, the Glenhill Long Fund loaned the Company $2 million, which was repaid in November 2011.[100]

In late August 2011, DWR received an inquiry from Herman Miller, its largest supplier, about a possible acquisition, which indicated a preliminary total enterprise valuation of the Company in the range of $25 million to $30 million.[101] According

---

[96] JX 147 at HMI 0051837.

[97] *See* JX 147 at HMI 0051830; JX 160 at GH_WS0041151.

[98] Tr. 65-66 (Krevlin); Tr. 589-92 (McPhee).

[99] Tr. 589-90 (McPhee).

[100] *See* JX 167 (July 21, 2011 Board consent granting Glenhill a warrant to purchase 1.5% of the Company's outstanding common stock if the loan was not repaid in full by January 1, 2012); JX 189 at HMI 0057912. The repayment of the loan in November 2011 obviated the need to issue a warrant to Glenhill for making the loan. Tr. 66 (Krevlin), Tr. 591-92 (McPhee).

[101] PTO ¶ 31.

to Krevlin, the Company was "not excited" about the indication of interest, which he thought was "too low."[102] Over the following months, Herman Miller signed a non-disclosure agreement and received access to a due diligence room, but did not make an offer at that time.[103]

### I. The 2012 Financing

At the end of 2011, "things were starting to turn positive . . . The company was making money [and] moved from a defensive position to going on offense."[104] Management prepared a budget for 2012 contemplating $3.3 million of capital expenditures.[105] As Shapiro explained, "the [C]ompany was not in the same type of distress that it was in 2010 and 2009" and was seeking to raise "offensive capital."[106]

During the first half of 2012, the Board discussed a private placement to raise a total of $2.5 million.[107] A transaction was consummated on July 19, 2012, when the Company entered into a series of agreements concerning (i) the sale of stock and granting of options to raise up to $2.5 million; (ii) modification of the Windsong Note; and (iii) establishing a date for the conversion of the Series A Preferred.

---

[102] Tr. 150 (Krevlin).

[103] PTO ¶ 31.

[104] Tr. 594 (McPhee).

[105] *See* JX 188 at GH_WS0010732; Tr. 68-70 (Krevlin).

[106] Tr. 230 (Shapiro).

[107] PTO ¶ 33; *see also* JX 186 (November 22, 2011 email from Krevlin to Shapiro stating: "Edelman called they want to put in up to 2mil . . . And others can do up to 3mil?").

These transactions, which are referred to collectively as the "2012 Financing," involved the following components:

- The Company entered into a Securities Purchase Agreement with Edelman, McPhee, the Glenhill Long Fund, and Windsong II, an entity affiliated with Sweedler.[108] They collectively purchased 401,108 common shares for a total of $1.8 million, or $4.49 per share (the "2012 Stock Sale") as follows: Edelman and McPhee each paid $400,000 for 89,135 shares; and the Glenhill Long Fund and Windsong II each paid $500,000 for 111,419 shares.[109] Edelman and McPhee also each received an option to acquire up to $350,000 worth of additional shares of common stock at the same per share price of $4.49, which they exercised in December 2012.[110]

- The Company and Windsong I entered into an agreement by which the parties amended the Windsong Note to extend its maturity date by one year to October 3, 2013.[111] The PIK Dividend associated with the Series A Preferred continued to accrue until that date.[112]

---

[108] See JX 246 at DWR_EM_0002233, 2247 (listing Sweedler as "Managing Member" of Windsong II).

[109] PTO ¶ 36; JX 246 at DWR_EM_0002234-47.

[110] PTO ¶¶ 37, 42; JX 246 at DWR_EM_2240 § 4.3.

[111] PTO ¶ 39; JX 246 at DWR_EM_0002217-18.

[112] JX 512 ¶ 66; Tr. 75 (Krevlin) ("[W]e would stop the PIKing on October [2013]"). The Letter Agreement does not state that the PIK Dividend will stop accruing before the conversion date but provides that, upon conversion, "the undersigned shall no longer have

25

- The Company, Windsong I, the Glenhill Long Fund, and the Glenhill Overseas Fund entered into a Letter Agreement by which the parties agreed that on October 3, 2013 (i) all outstanding principal of the Windsong Note would be converted into shares of common stock at a conversion price of $3.5339; and (ii) the Glenhill Long Fund and the Glenhill Overseas Fund would convert all of their Series A Preferred shares into common stock (the "2013 Conversions").[113] The parties also agreed that Windsong I's "rights to any interest on the Note are hereby forfeited and that the sole obligation of the Company with respect to the Note shall be the issuance of the Conversion Shares."[114]

In connection with the 2012 Financing, the Company filed an amendment to its certificate of incorporation, increasing the number of authorized shares of common stock from 600,000 to 1.6 million shares.[115]

Krevlin believed the 2012 Financing was "a home-run transaction."[116] He explained the rationale for the transaction at trial, as follows:

---

any rights with respect to [the Windsong Note] (other than the issuance by the Company of the Conversion Shares)."  JX 246 at DWR_EM0002209.

[113] PTO ¶ 40; JX 246 at DWR_EM_0002208-2213.

[114] JX 246 at DWR_EM_0002209; *see also* Tr. 74, 166 (Krevlin).

[115] PTO ¶ 35; JX 118 at DWR_EM_0000099-100.

[116] Tr. 75 (Krevlin).

[W]e did a holistic solution here which was a negotiation where every party gave up something . . . [Windsong Brands] took the 2012 note and they pushed it out one year to October of 2013 [and] agreed that they would not take any interest . . . which at that point was $600,000 . . . And they agreed to convert that security, the $5 million security, at the PIK preferred conversion price on October of '13. [The Glenhill Overseas Fund said that] we would stop the PIKing on October [2013], so that that would allow everything to collapse into a simplified structure. So by us stop[ping] PIKing, you stop the dilution on the preferred piece. You basically got Windsong to convert their note, give up interest at exactly the same conversion price as the PIK preferred, which I believe was $3.25, and the equity investment was made. So we simplified everything. Windsong gave up a fair amount. We gave up the PIK, and we were able to get . . . management to invest further in the equity.[117]

As with the Windsong Note, the 2012 Financing was the product of a conflicted and deficient process. There are no minutes reflecting the Board's consideration of the 2012 Financing, and it never hired an outside financial advisor.[118] Shapiro again was tasked by Krevlin to negotiate on behalf of the Company against Sweedler, who represented the Director Defendants, including Krevlin.[119] Shapiro and Sweedler did not negotiate vigorously. There is no documentary evidence of price negotiations, and Sweedler admitted that he and Krevlin had "two securities that were bumping up against each other," *i.e.* Glenhill's

---

[117] Tr. 74-75 (Krevlin).

[118] Tr. 651 (McPhee).

[119] Tr. 78 (Krevlin).

27

Series A Preferred and the Windsong Note, and "were trying to protect each other's interest at the end of the day."[120]

Krevlin, Shapiro, and Sweedler testified that at least two data points were used to determine the price of the 2012 Financing, which implied a $27 million valuation of the Company:[121] (i) the indication of interest from Herman Miller at a $25 million to $30 million enterprise value; and (ii) Glenhill's internal valuation of the Company indicating a value of $4.41 per share as of December 31, 2011.[122] No documents confirm that Shapiro and Sweedler actually used those data points to negotiate the price per share.

## J. The Anti-Dilution Grants

On July 17, 2012, when the 2012 Financing was under consideration, the Company granted an additional 19,654 restricted shares of common stock to Windsong Brands and awarded Edelman and McPhee 55,459 and 41,594 options to purchase common stock in the Company (the "Anti-Dilution Grants").[123] The restricted stock had the same terms as the restricted stock in the Brands Grant.[124]

---

[120] JX 487 at 176-77 (Sweedler Dep.); Tr. 913-14 (Sweedler).

[121] Tr. 160 (Krevlin).

[122] JX 203 at GH_WS11399; Tr. 78 (Krevlin); Tr. 893-94 (Sweedler); Tr. 216-17, 337-40 (Shapiro).

[123] PTO ¶ 34; JX 239; JX 235.

[124] *See* JX 240 at SJ_SBPN_0001120 (email from Shapiro to counsel).

McPhee and Shapiro testified that they believed Edelman and McPhee were supposed to receive anti-dilution protection for the options they were granted under their employment agreements,[125] but those agreements do not contain that protection.[126] Sweedler similarly testified that anti-dilution protection should have been included in the documentation for the Brands Grant,[127] but it was not.[128] The Anti-Dilution Grants were made to offset the dilution each of them otherwise would have suffered by the PIK Dividend and other dilutive events since the Brands Grant and employment agreements were executed.[129]

### K. The 2013 Conversions

On October 8, 2013, Shapiro contacted England of Ellenoff Grossman to complete the paperwork to effectuate the 2013 Conversions.[130] On October 22, 2013, Ellenoff Grossman delivered to the Company (i) a notice of conversion, dated October 16, 2013, purporting to convert the entire amount of the Windsong Note into 1,414,868 shares of common stock; and (ii) a notice of conversion, dated

---

[125] Tr. 239 (Shapiro); Tr. 560, 599-600 (McPhee); *see also* Tr. 141 (Krevlin).

[126] *See* JX 49 at DWR_EM_0001471 § 2.3, 001485 § 2.3 (stock option provisions of McPhee's and Edelman's employment agreements).

[127] Tr. 869-70 (Sweedler).

[128] *See* JX 180.

[129] *See* Tr. 599-602 (McPhee); JX 237 (email from McPhee stating "DWR will be issuing additional options to John & me to cover dilution that has occurred since our options were issued").

[130] Tr. 243-44 (Shapiro); JX 288 at GH_WS0059422.

October 3, 2013, purporting to convert 1,432,397 shares of Series A Preferred held by Glenhill into 3,936,571 shares of common stock.[131] The next day, the Company requested that the transfer agent issue the shares requested in the two notices of conversion.[132]

At the time of the 2013 Conversions, the Company was authorized to issue only 1.6 million shares of common stock,[133] but the 2013 Conversions purported to convert the Series A Preferred and Windsong Note into a total of 5,351,439 shares of common stock—1,414,868 shares for the Windsong Note, and 3,936,571 shares for the Series A Preferred.[134] On October 28, 2013, after this problem was brought to his attention, Englard sent the Company's CFO Lorraine DiSanto and Shapiro forms of consent for the Board and majority stockholder to increase the number of authorized shares of common stock to 7.5 million.[135]

On October 30, 2013, the Company filed with the Delaware Secretary of State an amendment to the Company's certificate of incorporation stating that the Company was authorized to issue 7.5 million shares of common stock and 30,000

---

[131] PTO ¶¶ 44-45, 47; *see also* JX 301 at DWR_EM_11984-85 (notices of conversion).

[132] PTO ¶ 48.

[133] *See* PTO ¶ 35.

[134] PTO ¶¶ 44, 47.

[135] PTO ¶ 49; JX 305 at GH_WS0059631.

shares of preferred stock.[136]  Although Ellenoff Grossman did not deliver the notices of conversion to the Company until October 22, 2013,[137] the Board's written consent approving the 2013 Conversions was dated as of October 3, 2013.[138]

### L. The Merger and the Change of Control Bonuses

In November 2013, the Board retained Financo LLC to provide financial advisory services in connection with a potential sale of the Company.[139]  Financo contacted a number of potential strategic and financial buyers for the Company, which ultimately led to a transaction with Herman Miller.[140]

In July 2014, Herman Miller agreed to purchase the Company for an enterprise value of $183 million or an estimated equity value of approximately $170.4 million, subject to certain adjustments.[141]  The transaction contemplated combining DWR with Herman Miller's consumer business and involved a number of steps.  In simplified form: (i) Herman Miller purchased approximately 83% of the Company's total equity from certain "Selling Stockholders" for $155 million in cash,

---

[136] PTO ¶ 51.

[137] PTO ¶¶ 44-45.

[138] PTO ¶ 52; *see also* JX 295 (notice of conversion dated October 3, 2013).

[139] PTO ¶ 53; JX 313.

[140] *See* JX 340 at FINANCO0001135.

[141] PTO ¶ 60; JX 411 at HMI 0002037.

31

or $23.9311 per share;[142] (ii) Edelman and McPhee exchanged some of their DWR shares (representing approximately 14% of the outstanding shares of the Company) for an 8% interest in HM Springboard, Inc., a newly formed subsidiary of Herman Miller that ultimately would own all of the shares of the Company as well as the shares of a subsidiary of Herman Miller holding its consumer business; and (iii) DWR ended up as the surviving entity of a short-form merger with HM Catalyst, Inc., a wholly owned subsidiary of HM Springboard, in which the remaining stockholders of the Company were cashed out for $23.9311 per share plus a potential amount for a working capital adjustment.[143] The Merger closed on July 28, 2014.[144]

During due diligence for the Merger, DWR's counsel discovered that a greater number of options had been granted to twelve employees, including Edelman and McPhee, than was authorized under the Company's 2009 Equity Incentive Award Plan.[145] In response to this problem, the Company's counsel recommended treating the options as bonuses, so that the employees would receive the cash equivalent of

---

[142] The Selling Stockholders were the Glenhill Overseas Fund, the Glenhill Long Fund, Windsong Brands, Windsong DB, LLC, Jamieson Investments, LLC, Edelman, and McPhee. PTO ¶ 60.

[143] JX 421 at AF 000011-12; PTO ¶ 64. As part of the transaction, the Selling Stockholders agreed to place $18.5 million of their proceeds into escrow to secure certain contingent liabilities of the Company. No other stockholder contributed to the escrow. PTO ¶ 65.

[144] PTO ¶ 63.

[145] *See* JX 363 at Financo_0056244; *see also* JX 394 at DWR_EM_0006760; JX354, 358, 359, 361.

what they would have received had they exercised their options, as they were entitled to do, upon a change of control (the "Change of Control Bonuses").[146]

By letter agreements dated July 21, 2014, the Company agreed to pay the Change of Control Bonuses in lieu of the options. In exchange, the recipients provided general releases and relinquished their ability to roll over their shares.[147] In total, $3,858,508 in Change of Control Bonuses were paid, with Edelman receiving $1,143,780, and McPhee receiving $857,819.[148]

In August 2014, a Notice of Merger and Appraisal Rights (the "Merger Notice") was mailed to DWR's stockholders of record.[149] The Merger Notice provided background information about the Company, described the Merger, outlined the stockholders' appraisal rights, and attached copies of three years of the Company's financial statements and a fairness opinion from Financo.[150]

### M. The Litigation Begins and Herman Miller Becomes Aware of the Defects Concerning the Reverse Stock Splits and 2013 Conversions

On December 19, 2014, plaintiffs filed their initial Verified Complaint, which they amended on March 12, 2015.[151] On November 13, 2015, plaintiffs filed their

---

[146] JX 363 at Financo_0056244.

[147] PTO ¶ 61; Tr. 620 (McPhee); JX 394 (letter agreements with option holders).

[148] PTO ¶ 62. These figures are rounded to the nearest dollar for simplicity.

[149] *See, e.g.* JX 423; JX 424; JX 506.

[150] JX 421 at AF000002-20, 26-103.

[151] Dkts. 1, 16.

Second Amended Complaint, which added Herman Miller as a defendant and asserted for the first time that the Merger was void. According to plaintiffs, the Selling Stockholders owned only approximately 60% of the Company's common stock as a result of defects concerning the Reverse Stock Splits and 2013 Conversions, meaning that Herman Miller failed to acquire the 90% ownership interest required to effectuate a short form merger under 8 *Del. C.* § 253.[152]

Although Herman Miller, with the assistance of its financial and legal advisors, conducted extensive due diligence in connection with the Merger, it did not become aware of any defects associated with the Reverse Stock Splits and 2013 Conversions until after this litigation began.[153] The general counsel of Herman Miller could not explain how his diligence team could have missed those issues.[154]

### N.    The Ratification Resolutions

Shortly after Herman Miller was added as a defendant, the Company engaged Delaware counsel (Richards, Layton & Finger, P.A.) to review its corporate records

---

[152] Dkt. 61 ¶¶ 96-106.

[153] Tr. 789 (Lopez); *see also* Tr. 737, 771, 780-81, 786-91 (Lopez). Plaintiffs suggested for the first time at post-trial argument that Glenhill recognized the double dilution problem before the Merger closed based on a memorandum attached to a July 11, 2014 email, which stated "[w]hat they really care about is the PIPE and not take risk on the conversion and PIK, etc." Tr. 185 (May 22, 2018); JX370 at GH_WS0050206. I reject this contention. The cited document is ambiguous on its face, and plaintiffs made no effort during discovery to ask questions about it. Tr. 187-88 (May 22, 2018). Based on the preponderance of the evidence, I find that no one at Glenhill or any of the other defendants was aware of the double dilution problem before the Merger closed.

[154] Tr. 760 (Lopez).

"in light of [plaintiffs'] allegations regarding the validity of certain corporate actions of DWR in the Second Amended Verified Complaint."[155]

On February 10, 2016, the Company's Board (then consisting of Edelman, McPhee, Krevlin, Brian Walker, Ben Watson, and Steve Gane) approved under 8 *Del. C.* § 204 a set of resolutions that, among other things, ratified certain defective corporate acts and putative stock relating to the Reverse Stock Splits and 2013 Conversions (the "Ratification Resolutions").[156] That same day, Herman Miller Consumer Holdings Inc., as the sole stockholder of DWR, approved the Ratification Resolutions in all respects.[157]

On February 11, 2016, the Company filed with the Delaware Secretary of State four certificates of validation contemplated by the Ratification Resolutions concerning the ratification of the following defective corporate acts:

- "a 50-to-1 reverse stock split purportedly effected on August 23, 2010 pursuant to which each fifty (50) shares of Common Stock . . . were reclassified and combined into one (1) share of Common Stock;"

- an amendment to the Company's certificate of incorporation filed with the Delaware Secretary of State "on August 23, 2010 in connection with a 50-to-1 reverse stock split," which "reduced the number of shares of the Company's preferred stock . . . below the number of shares of Preferred Stock designated as Series A Junior Participating Preferred Stock;"

---

[155] JX 449 at HMI 0081976.

[156] PTO ¶¶ 67-68; JX 456 Ex. E.

[157] PTO ¶¶ 69; JX 456 Ex. F.

35

- "a 50-to-1 reverse stock split purportedly effected on August 23, 2010 pursuant to which each fifty (50) shares of [Series A Preferred] were reclassified and combined into one (1) share of Convertible Preferred Stock;"

- an amendment to the Company's certificate of incorporation filed with the Delaware Secretary of State on August 23, 2010, which "reduced the number of shares of the Company's preferred stock . . . below the number of shares of Preferred Stock designated as Convertible Preferred Stock;"

- "the purported issuance of 3,936,571 shares of Common Stock . . . on October 23, 2013 upon conversion of certain shares of Convertible Preferred Stock;"

- "the purported issuance of 5,351,439 shares of Common Stock [on October 23, 2013] consisting of 3,936,571 shares of Common Stock issued upon the purported conversion of certain shares of [Series A Preferred] and 1,414,868 shares of Common Stock issued upon the purported conversion of certain convertible notes of the Company;" and

- an amendment to the Company's certificate of incorporation filed with the Delaware Secretary of State on October 30, 2013 that "increase[d] the number of authorized shares of Common Stock from 1,600,000 shares of Common Stock to 7,500,000 shares of Common Stock."[158]

The Ratification Resolutions also recite that, on July 19, 2012, the Company filed an amendment to the Company's certificate of incorporation that increased the number of authorized common shares from 600,000 to 1.6 million, but the amendment "failed to state that it had been approved by the Company's stockholders

---

[158] PTO ¶ 70; JX 456 Exs. A-D (certificates of validation) & Ex. E (Board resolutions) at 7-8. The Board also ratified the issuance of "20 shares of Common Stock in connection with the rounding up of fractional shares in the Common Stock Reverse Stock Split." JX 456 Ex. E at 2-3. The relevant resolution recites that stockholder approval was not required for this action. *Id.* at 3.

by written consent in lieu of a meeting" and the Company "failed to send the notice required by Section 228(e)."[159] The Board determined that this 2012 amendment was not a defective corporate act under Section 204 and did not require ratification, but resolved to file a certificate of correction with respect to the 2012 amendment.[160]

## II.    CLAIMS ADJUDICATED AT TRIAL

On August 14, 2017, about three months before trial, plaintiffs filed their Fourth Amended Complaint (the "Complaint").[161] It asserted the following twelve claims that were to be presented at trial:

- Count I, asserted against all defendants, seeks rescissory damages in connection with the Merger;

- Count II, brought against all defendants other than Herman Miller, asserts a claim for breach of fiduciary duty and "unlawfully benefiting" on the theory that "defendants received a far greater portion of the sum Herman Miller paid to acquire DWR than they were entitled to receive;"[162]

- Count III asserts a conversion claim against all defendants on the theory that through the Merger, defendants unlawfully exercised control and dominion over plaintiffs' shares;

- Count IV, brought against the Director Defendants, asserts a claim for breach of fiduciary duty and "unlawfully benefitting" from void acts in connection with the stock sale that occurred as part of the 2012 Financing;

---

[159] JX 456 Ex. E at 6.

[160] *Id.*

[161] Dkt. 301.

[162] Compl. ¶ 137.

37

- Count V, brought against the Director Defendants, asserts a claim for breach of fiduciary duty and "unlawfully benefiting" from void acts in connection with the Series A Preferred conversion in 2013;

- Count VI, brought against the Director Defendants, asserts a claim for breach of fiduciary duty and "unlawfully benefitting" from void acts in connection with the Windsong Note, the modification of the Windsong Note as part of the 2012 Financing, the conversion of the Windsong Note in 2013, the Brands Grant, and the anti-dilution grant to Windsong Brands;

- Count VII asserts a breach of fiduciary duty claim against the Glenhill Defendants as controlling stockholders in connection with the Windsong Note, the 2012 Financing, the 2013 Conversions, the Brands Grant, and the anti-dilution grant to Windsong Brands;

- Count VIII asserts an unjust enrichment claim against all defendants except Herman Miller;

- Count IX, brought against the Director Defendants and the Glenhill Defendants, asserts a breach of the fiduciary duty of disclosure claim based on the Merger Notice;

- Count X asserts a breach of the fiduciary duty of loyalty claim against the Director Defendants and the Glenhill Defendants in connection with the Change of Control Bonuses;

- Count XI asserts an aiding and abetting claim against Herman Miller; and

- Count XII asserts an equitable fraud claim against the Glenhill Defendants, the Director Defendants, and Herman Miller based on alleged material misrepresentations and omissions in the Merger Notice.

On May 31, 2018, after post-trial argument, plaintiffs conceded that Count VIII (Unjust Enrichment) had been waived.[163]

---

[163] Dtk. 378.

In addition to the claims recited above, the trial addressed a counterclaim filed by Herman Miller, HM Catalyst, Inc., and DWR. The counterclaim asserts a single claim seeking judicial validation under 8 *Del. C.* § 205 of the defective corporate acts identified in the Ratification Resolutions.[164]

The analysis of the claims that follows is divided into three parts. Section III analyzes the Section 205 counterclaim and related claims in the Complaint. Section IV analyzes plaintiffs' claims challenging the Windsong Note, Brands Grant, 2012 Financing, and Anti-Dilution Grants. Section V analyzes plaintiffs' remaining claims, which relate to the Merger.

## III. ANALYSIS OF SECTION 205 AND RELATED CLAIMS

Under Section 205 of the Delaware General Corporation Law, this court has the authority to "[d]etermine the validity and effectiveness of any defective corporate act ratified pursuant to § 204 of this title;" "[d]etermine the validity and effectiveness of any defective corporate act not ratified or not ratified effectively pursuant to § 204 of this title;" and "[d]etermine the validity of any corporate act."[165] "In connection with an action under [Section 205]," the court may, among other things, "[v]alidate and declare effective any defective corporate act" and "[d]eclare

---

[164] Dkt. 135.

[165] 8 *Del. C.* §§ 205(a)(1), (a)(3), (a)(4).

that a defective corporate act validated by the Court shall be effective as of the time of the defective corporate act or at such other time as the Court shall determine."[166]

Before deciding whether to exercise its authority under Section 205, "the Court must first determine whether there was a defective corporate act."[167]   The court then may consider the factors listed in Section 205(d) in deciding whether to exercise its authority under Section 205 to validate that defective corporate act.

Section 204(h)(1) defines "defective corporate act" as any act or transaction that is void or voidable due to a failure of authorization:

> "Defective corporate act" means an overissue, an election or appointment of directors that is void or voidable due to a failure of authorization, or any act or transaction purportedly taken by or on behalf of the corporation that is, and at the time such act or transaction was purportedly taken would have been, within the power of a corporation under subchapter II of this chapter . . .  but is void or voidable due to a failure of authorization.[168]

Section 204(h)(2) defines "failure of authorization" as a failure to effect an act in compliance with a company's certificate of incorporation to the extent the failure renders the act void or voidable:

> "Failure of authorization" means: (i) the failure to authorize or effect an act or transaction in compliance with (A) the provisions of this title, (B) the certificate of incorporation or bylaws of the corporation, or (C) any plan or agreement to which the corporation is a party, if and to the

---

[166] 8 *Del. C.* §§ 205(b)(2), (b)(8).

[167] *In re Numoda Corp. S'holders Litig.*, 2015 WL 402265, at *9 n.99 (Del. Ch. Jan. 30, 2015), *aff'd sub nom. In re Numoda Corp.*, 128 A.3d 991 (Del. 2015).

[168] 8 *Del. C.* § 204(h)(1).

extent such failure would render such act or transaction void or voidable.[169]

"Precisely because [Sections 204 and 205] were intended to cure inequities, 'failure of authorization' must be read broadly to allow the Court of Chancery to address any technical defect that would compromise the validity of a corporate action."[170]

## A.     The Acts the Board Ratified in the Ratification Resolutions Constitute Defective Corporate Acts

In the counterclaim, Herman Miller, HM Catalyst, and DWR ask the court to declare under Section 205 that the Merger and the ratification of the seven defective corporate acts identified in the Ratification Resolutions are valid.[171]  Plaintiffs do not oppose judicial validation of five of these defective corporate acts.[172]  For example, plaintiffs do not challenge the actions the Company took to remedy the failure to obtain Board and stockholder approval to combine and reclassify the common stock and Series A Preferred on a 50-to-1 basis in connection with the Reverse Stock Splits.  Instead, plaintiffs challenge only the Ratification Resolutions insofar as they seek to remedy the double dilution problem arising from the Reverse Stock Splits by validating the following two defective corporate acts:

---

[169] 8 *Del. C.* § 204(h)(2).

[170] *In re Numoda Corp.*, 128 A.3d 991, 991 (Del. 2015) (TABLE), 2015 WL 6437252, at *3.

[171] Countercl. ¶ 34 (Dkt. 301).

[172] Tr. 12-17 (May 1, 2018).

41

- "the purported issuance of 3,936,571 shares of Common Stock . . . on October 23, 2013 upon conversion of certain shares of Convertible Preferred Stock;" and

- "the purported issuance of 5,351,439 shares of Common Stock [on October 23, 2013] consisting of 3,936,571 shares of Common Stock issued upon the purported conversion of certain shares of [Series A Preferred] and 1,414,868 shares of Common Stock issued upon the purported conversion of certain convertible notes of the Company."

To repeat, the double dilution problem occurred because, instead of reducing by a factor of 50-to-1 the number of shares of common stock into which the Series A Preferred could convert upon a conversion event, the Reverse Stock Splits reduced by a factor of 2500-to-1 the number of shares of common stock into which the Series A Preferred could convert. This occurred because of the combined effect of two actions: (i) the 50-to-1 reverse split *of the common stock* triggered a 50-to-1 reduction in the number of shares of common stock into which each share of Series A Preferred could convert under the adjustment provision in Section 7(a) of the Series A COD; and (ii) the 50-to-1 reverse split *of the Series A Preferred itself* reduced by 98% the number of shares of Series A Preferred outstanding without providing for an adjustment to the Conversion Formula for the Series A Preferred because the Series A COD did not contain an adjustment provision in the event of a reverse split of the Series A Preferred itself. There is *zero* evidence in the record that anyone involved intended for the Reverse Stock Splits to cause this double dilution.

42

The flaws in the implementation of the Reverse Stock Splits in 2010 became a problem in 2013 when the Company purported to convert the Series A Preferred into 3,936,571 common shares, although no one recognized the problem at the time. It is undisputed as a mathematical matter that Glenhill was entitled to receive *at least* 3,936,571 common shares upon the conversion of its shares of Series A Preferred in October 2013 if the Reverse Stock Splits had been implemented correctly to reduce by a factor of 50-to-1 (and not by 2500-to-1) the number of shares into which the Series A Preferred could convert.[173] Because of the defects arising from the implementation of the Reverse Stock Splits, however, the Series A Preferred could not be converted into 3,936,571 common shares at that time but could only be converted into about 1/50[th] of that figure, *i.e.*, approximately 78,731 common shares. The Ratification Resolutions addressed this plainly unintended consequence by

---

[173] As previously explained, Glenhill had the right under the Series A COD to receive cumulative dividends at the rate of 9% per year compounding annually to be paid in-kind in the form of additional shares of Series A Preferred with the option to let the PIK Dividend (i) accrue to the next "Dividend Payment Date" or (ii) accrete to, and increase, the Stated Value of the Series A Preferred. JX 23 § 3(a). It is undisputed that PIK Dividends were not paid to Glenhill at any time before its shares of Series A Preferred were converted in October 2013. It also has never been disputed as a mathematical matter that, if the PIK Dividends were deemed to accrete to and increase the Stated Value of the Series A Preferred, Glenhill would have been entitled to convert its Series A Preferred shares in October 2013 into approximately 3,956,867 common shares, which is approximately 20,000 more than the number of common shares that Glenhill purportedly received (*i.e.*, 3,936,571) in connection with the 2013 Conversions. *See* Dkt. 201 at 21-22 (explaining that the Stated Value would have increased from $12.69 to approximately $18.27 on October 23, 2013, the date of conversion, so that 20,000 shares of Series A Preferred would convert into approximately 3,956,687 common shares (20,000 shares X [$18.27/0.09235])).

amending Section 7(a) of the Series A COD to eliminate one of the two actions that caused the double dilution by providing "that no adjustment shall be made pursuant to this Section 7(a) . . . in respect of the 50-to-1 reverse stock split of the Common Stock effected . . . on August 23, 2010."[174]

Plaintiffs' primary point of contention in opposing the counterclaim concerns this amendment to Section 7(a). Specifically, plaintiffs argue that the court should not validate this amendment because defendants "have not identified any [defective corporate act] that was rendered void or voidable by the failure to amend [Section 7(a)]."[175] I disagree.

To begin, the issuance of 3,936,571 common shares to Glenhill upon the conversion of its Series A Preferred was void because it violated Section 7(a) of the Series A COD as it existed before that provision was amended as a result of the Ratification Resolutions. "[U]nder Delaware law, a corporate action is void where it violates a statute or a governing instrument such as the certificate of incorporation or the bylaws."[176] The Series A COD was part of the Company's certificate of

---

[174] *See* JX 456 Ex. C at 6.

[175] Pls.' Reply Br. at 5-6.

[176] *Southpaw Credit Opportunity Master Fund, L.P. v. Roma Rest. Hldgs., Inc.*, 2018 WL 658734, at *5 (Del. Ch. Feb. 1, 2018); *see also In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *47 (Del. Ch. Feb. 12, 2018) ("Historically, if a corporation failed to follow corporate formalities when issuing shares, then a party challenging the issuance had strong grounds to contend that the issuance was void and could not be validated in equity, whether through the invocation of equitable defenses or otherwise.").

44

incorporation,[177] and thus a corporate action violating the Series A COD would be a void act. Here, the Company purported to issue Glenhill 3,936,571 common shares as part of the 2013 Conversions but, as the parties agree, Glenhill's Series A Preferred could not be converted into that many common shares under the original version of Section 7(a) of the Series A COD.[178] In other words, the Company issued Glenhill more shares in 2013 than it was entitled to under the original Series A COD, which made that issuance void.

The Company's failure to amend Section 7(a) is a failure of authorization with respect to the 2013 Conversions because it rendered the issuance of 3,936,571 common shares to Glenhill void.[179] As discussed above, Glenhill suffered the prospect of double dilution because of the Reverse Stock Splits, which reduced by a factor of 2500-to-1 the number of common shares into which its Series A Preferred

---

[177] *See Elliott Associates, L.P. v. Avatex Corp.*, 715 A.2d 843, 845, n. 3 (Del. 1998) ("When certificates of designations become effective, they constitute amendments to the certificate of incorporation.").

[178] *See* Herman Miller's Answering Br. at 16-17 ("[T]he failure to amend the certificate of designation at the time of the Reverse Stock Splits in 2010 caused the issuance of common shares to Glenhill upon the Conversion to be a defective corporate act because (assuming away the effect of ratification) Glenhill received 50 times more common shares than the certificate of designation entitled it to."); Pls.' Reply Br. at 7 ("Glenhill held only 20,000 Series A, which cannot be converted into 3,936,571 common shares under the original [Series A COD].").

[179] *See* JX 456 Ex. C at 2 (identifying as a failure of authorization the failure to "include an exception for the Common Stock Reverse Stock Split Amendment from the provisions that would otherwise adjust the number of shares of Common Stock into which [the Series A Preferred] is convertible").

45

could be converted. Thus, before Section 7(a) was amended, the Series A Preferred could be converted into only approximately 78,731 common shares. On the other hand, had the Company amended Section 7(a) immediately before the Reverse Stock Splits so that its adjustment provision would not apply to the reverse split of common stock, the Series A Preferred would have been convertible into at least 3,936,571 shares, and the issuance of that amount of shares would not have been void. In sum, the issuance of 3,936,571 shares of common stock in connection with the 2013 Conversions was a defective corporate act because the issuance of that many common shares was void due to the Company's failure to amend Section 7(a) of the Series A COD before the Reverse Stock Splits in 2010.

Plaintiffs argue, without citing any supporting legal authority, that the "temporal disconnect" between the failure to amend Section 7(a) in 2010 and the 2013 Conversions "demonstrates that the issuance of shares at the time of the Conversion cannot be a [defective corporate act] for which the failure to amend 7(a) is a failure of authorization."[180] I disagree.

The plain language of Section 205 does not contain a temporal limitation on the court's power to validate defective corporate acts, nor would such a limitation make sense where, as here, the effect of a defective corporate act may not manifest itself until years into the future. As noted previously, our Supreme Court has

---

[180] Pls.' Reply Br. at 6 (internal quotations omitted).

emphasized the need to "read broadly" the term "failure of authorization" to "cure inequities" and "to address any technical defect that would compromise the validity of a corporate action."[181] My conclusion that the Company's failure to amend Section 7(a) is a failure of authorization with respect to the 2013 Conversions accords with this approach, particularly given the highly technical nature of the defect and that the equities overwhelmingly support correcting this obviously unintended defect, as discussed below.

As a secondary matter, plaintiffs challenge judicial validation of the purported issuance of 5,351,439 shares of common stock on October 23, 2013, because there were only 1.6 million shares of common stock authorized at that time.[182] This is because the amendment to the Company's certificate of incorporation to increase the authorized number of shares of common stock from 1.6 million to 7.5 million was not approved until one week later, on October 30, 2013.[183] The Ratification Resolutions purported to fix this problem by changing the effective date of the amendment to October 22, 2013, before the 2013 Conversions.[184]

---

[181] *In re Numoda Corp.*, 128 A.3d at 991.

[182] *See* PTO ¶ 35; JX 118 DWR_EM_0000099-100.

[183] PTO ¶ 51; JX 308.

[184] *See* JX 456 at Ex. D at 2 (stating that the certificate amendment increasing the number of authorized common shares to 7.5 million "shall be deemed to have become effective as of October 22, 2013").

Plaintiffs do not dispute that the purported issuance of 5,351,439 shares of common stock in connection with the 2013 Conversions was a defective corporate act.[185] Rather, plaintiffs contend that the court "should not permit the Miller Parties to change the effective date and time to the [certificate of incorporation] amendment because [the Company] deliberately and improperly backdated the Amendment and the board resolutions approving it in October 2013," making it inappropriate for relief under Section 204.[186] This argument fails because, even if this defective corporate act was "not ratified effectively pursuant to § 204," the court still may determine its validity under Section 205[187] and, as I discuss below, all of the Section 205(d) factors weigh in favor of judicial validation of this and all of the other defective corporate acts set forth in the Ratification Resolutions.

## B. All of the Section 205(d) Factors Support Validating the Defective Corporate Acts Identified in the Ratification Resolutions

I turn now to the question of whether the court should ratify under Section 205 the defective corporate acts identified in the Ratification Resolutions. In making that determination, the court may consider the following factors:

---

[185] *See* Tr. 55 (May 1, 2018) ("[W]e do not challenge [the certificate amendment increasing the number of authorized shares to 7.5 million] because we believe that you can't increase the number of shares pursuant to the statute under normal circumstances . . . The reason we challenge that is because they backdated their effort to increase the number of shares, and even in this 204 notice, they continue the fiction that that was done on October 3.").

[186] Pls.' Reply at 19-20.

[187] 8 *Del. C.* § 205(a)(3).

(1)     Whether the defective corporate act was originally approved or effectuated with the belief that the approval or effectuation was in compliance with the provisions of this title, the certificate of incorporation or bylaws of the corporation;

(2)     Whether the corporation and board of directors has treated the defective corporate act as a valid act or transaction and whether any person has acted in reliance on the public record that such defective corporate act was valid;

(3)     Whether any person will be or was harmed by the ratification or validation of the defective corporate act, excluding any harm that would have resulted if the defective corporate act had been valid when approved or effectuated;

(4)     Whether any person will be harmed by the failure to ratify or validate the defective corporate act; and

(5)     Any other factors or considerations the Court deems just and equitable.[188]

In my opinion, all of the Section 205(d) factors weigh overwhelmingly in favor of judicial validation of the defective corporate acts identified in the Ratification Resolutions.

First, the record demonstrates that the Board effectuated the Reverse Stock Splits and 2013 Conversions with the reasonable belief that those transactions would be carried out by counsel in compliance with Delaware law and the Company's

---

[188] 8 *Del. C.* § 205(d); *see Cirillo Family Trust v. Moezinia*, 2018 WL 3388398, at *8-9 (Del. Ch. July 11, 2018).

certificate of incorporation and bylaws.[189] The reality is that counsel tasked with documenting these transactions botched them up unbeknownst to anyone associated with the transactions until after they had been implemented. There is no credible evidence to the contrary. Indeed, given that the implementation of the Reverse Stock Splits, if not corrected, would have gutted the value of Glenhill's Series A Preferred upon a conversion, it is inconceivable that Krevlin or anyone associated with Glenhill knew about the double dilution problem when the Reverse Stock Splits and the 2013 Conversions were implemented.

Second, the record shows that the Board always treated the defective corporate acts as if they were valid and effective. The Board disclosed the Reverse Stock Splits in a press release[190] and to FINRA[191] and purported to take official action by signing Board resolutions approving the Reverse Stock Splits and 2013 Conversions[192] and by authorizing amendments to the Company's certificate of incorporation in connection with both transactions.[193] Numerous parties relied on

---

[189] Tr. 61-63, 84-85, 133 (Krevlin); Tr. 476-77 (Edelman); Tr. 587-89, 651-52 (McPhee) Tr. 889-90 (Sweedler); *see also* Tr. 299 (Shapiro).

[190] JX 130.

[191] JX 125.

[192] JX 122; JX 285.

[193] PTO ¶¶ 29, 51.

the public record of validity, including those who traded in DWR stock over a four-year period (including both plaintiffs)[194] and Herman Miller.[195]

Third, no one legitimately will or could claim to be harmed by the ratification of the defective corporate acts. The only conceivable harm is that plaintiffs will lose a large claim for damages. But that is not a cognizable harm under Section 205(d)(3) because plaintiffs would not have suffered that harm had the defective corporate acts been carried out correctly in first instance.[196] Indeed, plaintiffs' selective opposition to validation of the defective corporate acts in the Ratification Resolutions (*i.e.*, not opposing validation of the Reverse Stock Splits but opposing validation of the issuances to preserve the double dilution problem) betrays an intention to obtain a windfall for themselves in this litigation.

---

[194] *See* Tr. 1143-47 (Franklin) (discussing how Almond purchased DWR stock between 2009 and the Merger); JX 432 (showing that Franklin bought and sold DWR stock in 2014); JX 455 (showing that Almond bought DWR stock between 2010 and 2014).

[195] *See* Tr. 734-37 (Lopez) (explaining that "DWR and its advisors would have loaded up onto a data room all information regarding the shareholdings of the company"); JX 502 at 56-57 (Walker) (testifying that he did not have any concerns about DWR's capital structure before the closing). Plaintiffs assert that sufficient information was made available to Herman Miller during due diligence for it to detect the defective corporate acts. Even if this is theoretically true, it is of no moment. Herman Miller's General Counsel, who oversaw the internal personnel and outside advisors responsible for Herman Miller's due diligence, testified credibly that Herman Miller did not actually become aware of these defects until after the litigation began. Tr. 789 (Lopez).

[196] *See* 8 *Del. C.* § 205 (d)(3) (excluding from the factors the statute identifies for consideration "any harm that would have resulted if the defective corporate act had been valid when approved or effectuated").

51

Fourth, Glenhill and the individual defendants stand to be harmed by the defective corporate acts because plaintiffs seek damages from them (*e.g.*, Counts II, III, and V) for receiving more Merger consideration than they would have received if the defective corporate acts are not validated. Herman Miller and its stockholders similarly stand to be harmed if the defective corporate acts are not ratified because plaintiffs seek damages from them on the theory that "the Merger was void *ab initio* because it did not comply with Delaware law."[197]

Fifth, ratification is clearly the equitable outcome. Defendants are requesting that the court restore the Company and its stockholders to the positions they believed they occupied at all times from the Reverse Stock Splits in 2010 through the Merger in 2014. This is the "preferred remedy."[198] There is no inequitable motivation underlying the Company's failure to implement and document the Reverse Stock Splits and 2013 Conversions correctly. To the contrary, defendants had nothing to gain but much to lose by the failures, and Herman Miller took action to fix the defective corporate acts promptly after they came to its attention. Plaintiffs, on the

---

[197] Compl. ¶ 141.

[198] C. Stephen Bigler & John Mark Zeberkiewicz, *Restoring Equity: Delaware's Legislative Cure for Defects in Stock Issuances and Other Corporate Acts*, 69 BUS. LAW. 393, 427 (2014) ("The ratification statutes, when effective, will eliminate the uncertainty faced by counsel and courts confronted with defects in stock issuances and other corporate acts by providing a practical and certain path to curing those defects that will result in the corporation and its stockholders being restored to the positions they thought they occupied and having the interests they thought they had before the defects were discovered. In most cases, this will be the preferred remedy.").

other hand, seek an inequitable windfall for technical defects that DWR, the Board, Glenhill, and Herman Miller had no idea occurred until after the Merger.[199]

* * * * *

For the reasons discussed above, the court grants the request to validate under Section 205 the defective corporate acts identified in the Ratification Resolutions. Accordingly, judgment will be entered in favor of the Herman Miller, HM Catalyst, and DWR and against plaintiffs on the counterclaim.

Counts II, III, and V of the Complaint all appear to proceed from the premise that one or more of the defendants unlawfully benefited from, or converted to his own benefit, a greater percentage of the Company's equity in connection with the Merger than he would have received if the defective corporate acts had not been validated.[200] Because the defective corporate acts have been validated, these three

---

[199] Plaintiffs argue that the Company's ratification under Section 204 was approved by a conflicted Board (consisting of Krevlin, Edelman, McPhee, Walker, Watson, and Gane) and does not meet the entire fairness test. No statutory support or precedent is cited in support of this puzzling argument. Putting aside that plaintiffs were not stockholders of the Company when the Board approved the ratifying actions and thus would have no standing to assert a breach of fiduciary duty claim relating thereto, all of the considerations discussed above demonstrating that the Section 205(d) factors overwhelmingly weigh in favor of judicial validation as the only equitable outcome equally support the conclusion that the Board's ratification under Section 204 was entirely fair.

[200] *See* Compl. ¶¶ 136-39 (Count II: claim for breach of fiduciary duty and "unlawfully benefitting" from "Invalid Transaction"); ¶¶ 140-43 (Count III: conversion claim that "the Merger was void *ab initio* because it did not comply with Delaware law"); ¶¶ 155-62 (Count V: claim for breach of fiduciary duty and "unlawfully benefitting" from "Void Acts").

claims necessarily fail. Accordingly, judgment is entered in favor of the relevant defendants and against plaintiffs on Counts II, III, and V.

## IV.   ANALYSIS OF OVERPAYMENT CLAIMS

In this section, the court considers plaintiffs' claims for breach of fiduciary duty relating to four transactions: the (i) Windsong Note; (ii) Brands Grant; (iii) 2012 Financing, including the 2012 Stock Sale and the extension of the Windsong Note; and (iv) Anti-Dilution Grants. I refer to these claims, at times, collectively as the "Overpayment Claims" because they each concern the authorization of transactions that allegedly unfairly benefitted some or all of the Director Defendants or their affiliates through the issuance of additional equity in the Company before or in connection with the Merger. Specifically, taking the four transactions in chronological order, plaintiffs contend that:

- All four members of the Board (Krevlin, Sweedler, Edelman, and McPhee) had a financial interest in and unfairly benefitted from the Windsong Note issued in May 2010, which was structured as a loan convertible into common stock.

- Windsong Brands—and thus its principal Sweedler—was overpaid for the restructuring work it performed in 2009 when the Company granted it restricted stock, which would vest only upon a change of control, in September 2011 (*i.e.*, the Brands Grant).

- Windsong Brands, Edelman, and McPhee received an unfair benefit in July 2012 when they were awarded restricted stock and stock options (*i.e.*, the Anti-Dilution Grants) to offset dilution they each would have suffered as a result of dilutive events that occurred after Windsong Brands received the Brands Grant and after Edelman and McPhee signed their employment agreements. To be clear, those agreements did not contain anti-dilution protection.

- All four members of the Board again had financial interests in and unfairly benefitted from the 2012 Stock Sale and the extension of the Windsong Note that were components of the 2012 Financing approved in July 2012.

With respect to each of the Overpayment Claims, a threshold issue is whether plaintiffs have standing to assert those claims in light of the Merger. It is plaintiffs' burden to prove they do.[201]

It is well established under our Supreme Court's decision in *Lewis v. Anderson* and its progeny that, as a general matter, a merger extinguishes a plaintiff's standing to maintain a derivative suit.[202] This is because "a derivative claim is a property right owned by the nominal corporate defendant [that] flows to the acquiring

---

[201] *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1260 n. 57 (Del. 2016) (quoting *Dover Historical Soc'y v. City of Dover Planning Comm'n.*, 838 A.2d 1103, 1109 (Del. 2009)).

[202] 477 A.2d 1040, 1049 (Del. 1984).

55

corporation by operation of a merger."[203]    Delaware law recognizes two

circumstances where a merger would not extinguish a stockholder's standing to

maintain a derivative claim,[204] but neither is present here, as plaintiffs concede.[205]

To determine whether a claim is direct or derivative, the court must consider

"(1) who suffered the alleged harm (the corporation or the suing stockholders,

individually); and (2) who would receive the benefit of any recovery or other remedy

(the corporation or the stockholders, individually)?"[206] "In the typical corporate

overpayment case, a claim against the corporation's fiduciaries for redress is

regarded as exclusively derivative, irrespective of whether the currency or form of

overpayment is cash or the corporation's stock."[207]  "The reason is that, in the typical

corporate overpayment case, 'any dilution in value of the corporation's stock is

merely the unavoidable result (from an accounting standpoint) of the reduction in

---

[203] *Feldman v. Cutaia*, 951 A.2d 727, 731 (Del. 2008).

[204] *See Lewis*, 477 A.2d at 1047, n.10 ("The two recognized exceptions to the rule are: (1) where the merger itself is the subject of a claim of fraud; and (2) where the merger is in reality a reorganization which does not affect plaintiff's ownership of the business enterprise.").

[205] Tr. 85 (May 1, 2018).

[206] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

[207] *Gentile v. Rossette*, 906 A.2d at 99.

the value of the entire corporate entity, of which each share of equity represents an equal fraction.'"[208]

Consistent with these authorities, plaintiffs concede that all of the Overpayment Claims are derivative claims.[209] Plaintiffs nonetheless contend they have standing to maintain these claims under the "transactional paradigm" our Supreme Court recognized in *Gentile v. Rosette* where "a species of corporate overpayment claim" could be both direct and derivative in nature:

> A breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.[210]

Before focusing on plaintiffs' theory for applying the *Gentile* framework here, it bears mentioning that our Supreme Court recently construed the doctrine narrowly in the context of an alternative entity dispute in *El Paso Pipeline GP Co., L.L.C. v.*

---

[208] *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *7 (Del. Ch. July 26, 2018) (quoting *Gentile*, 906 A.2d at 99).

[209] Tr. 77 (May 1, 2018).

[210] *Gentile*, 906 A.2d at 99-100.

*Brinckerhoff*, with our Chief Justice even suggesting that *Gentile* should be overruled, at least in certain respects.[211]

In *El Paso*, a limited partner argued that its claim, which alleged overpayments by the partnership to the controlling general partner, fell within the *Gentile* framework because the overpayments diluted the minority limited partners' economic interests but concededly were "not coupled with any voting rights dilution."[212] The Supreme Court refused to apply *Gentile* to that claim:

> *Gentile* concerned a controlling shareholder and transactions that resulted in an improper transfer of both economic value *and* voting power from the minority stockholders to the controlling stockholder. [Plaintiff's] claim does not satisfy the unique circumstances presented by the *Gentile* species of corporate overpayment claims.[213]

The Court further explained, "[w]e decline the invitation to further expand the universe of claims that can be asserted 'dually' to hold here that the extraction of solely economic value from the minority by a controlling stockholder constitutes direct injury."[214] To do so, the Court reasoned, "would deviate from the

---

[211] *See El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1265–66 (Del. 2016) (Strine, C.J., concurring) ("*Gentile* cannot be reconciled with the strong weight of our precedent and it ought to be overruled, to the extent that it allows for a direct claim in the dilution context when the issuance of stock does not involve subjecting an entity whose voting power was held by a diversified group of public equity holders to the control of a particular interest.").

[212] *Id.* at 1252-53, 1264.

[213] *Id.* at 1263-64 (emphasis in original) (internal quotations and citations omitted).

[214] *Id.* at 1264.

*Tooley* framework and largely swallow the rule that claims of corporate overpayment are derivative."[215]

The consequence of the Supreme Court's ruling in *El Paso* was highly significant. It resulted in the reversal of a $171 million judgment for damages plaintiff had obtained because plaintiff's standing to maintain a derivative claim was extinguished under *Lewis v. Anderson* and its progeny when the limited partnership was acquired in a merger "after the trial was completed and before any judicial ruling on the merits" in what the high court described as a "troubling case."[216]

In the wake of *El Paso*, this court has exercised caution in applying the *Gentile* framework, commenting in one case that "[w]hether *Gentile* is still good law is debatable"[217] and finding in another that "*Gentile* must be limited to its facts."[218] Whatever the ultimate fate of the *Gentile* paradigm may be, the current state of the law for the doctrine to apply is that (i) there must be a controlling stockholder or control group; and (ii) the challenged transaction must result "in an improper transfer

---

[215] *Id.* (internal quotations and citations omitted).

[216] *Id.* at 1250-52.

[217] *ACP Master Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *26 n.206 (Del. Ch. July 21, 2017, *aff'd*, 2018 WL 1905256 (Del. Apr. 23, 2018).

[218] *Liberty Broadband Corp.*, 2018 WL 3599997, at *10.

59

of both economic value *and* voting power from the minority stockholders to the controlling stockholder."[219] I address each requirement, in turn, below.

## A. The Windsong Entities, Edelman, and McPhee Were not Part of a Control Group with Glenhill with Respect to the Overpayment Claims

Plaintiffs' theory for invoking *Gentile* proceeds from a novel premise. It is stipulated that Glenhill became DWR's majority stockholder when the 2009 Transaction closed, before any of the transactions underlying the Overpayment Claims occurred.[220] At that point, Glenhill's equity ownership in DWR was 92.8%.[221] It also is stipulated that Krevlin had the sole investment and voting power over all DWR shares Glenhill held at all relevant times.[222] Recognizing the reality that Glenhill was DWR's controlling stockholder at all relevant times, plaintiffs asserted a claim against "the Glenhill Defendants" with respect to some of the Overpayment Claims for breach of fiduciary duty as the "controlling shareholders of DWR."[223]

---

[219] *El Paso*, 152 A.3d at 1263–64 (emphasis in original).

[220] PTO ¶ 5. Technically, the shares were held by multiple Glenhill funds, but I refer to "Glenhill" in the singular for simplicity.

[221] JX 111 at DWR_EM_0000455; JX 513 ¶ 24.

[222] PTO ¶ 6.

[223] Compl. ¶¶ 174-75 (asserting that Glenhill breached its fiduciary duty as a controlling stockholder with respect to the Windsong Note, the extension of the Windsong Note, and the 2012 Stock Sale).

Despite Glenhill's indisputable status as DWR's controlling stockholder and the manner in which plaintiffs plead their controlling stockholder claim for breach of fiduciary duty, plaintiffs do not—for reasons that will become obvious—invoke the *Gentile* framework based on Glenhill's ownership position alone. Instead, relying on this court's decision in *In re Nine Systems Corporation Shareholders Litigation*,[224] plaintiffs argue that Edelman, McPhee, and the various Windsong entities (including Sweedler) were part of a control group along with Glenhill.

In *Nine Systems*, this court found after trial that three stockholders, none of which individually qualified as a controlling stockholder but the three of which collectively held approximately 54% of the company's equity, functioned as a control group for purposes of *Gentile*.[225] The court framed the analysis to find a control group, as follows:

> A group of stockholders, none of whom individually qualifies as a controlling stockholder, may collectively be considered a control group that is analogous, for standard of review purposes, to a controlling stockholder. A control group is accorded controlling stockholder status and, therefore, its members owe fiduciary duties to their fellow shareholders. Proving a control group is not impossible, but it is rarely a successful endeavor because it is a fact-intensive inquiry that requires evidence of more than mere parallel interests. A plaintiff must prove that the group of stockholders was connected in some legally significant way—e.g., by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal. The standard

---

[224] 2014 WL 4383127 (Del. Ch. Sept. 4, 2014), *aff'd sub nom. Fuchs v. Wren Holdings, LLC*, 129 A.3d 882 (Del. 2015).

[225] *Id.* at *2, *24-26.

does not necessarily require control over the day-to-day operations of a corporation; actual control with regard to the particular transaction that is being challenged may suffice.[226]

This court has applied this form of analysis to determine whether or not a group of stockholders, none of whom individually qualified as a controlling stockholder, constitutes a control group at least one other time for the purpose of determining whether a direct claim exists under the *Gentile* paradigm,[227] and on many occasions for other purposes outside of the *Gentile* context.[228]

Particularly instructive is this court's decision in *In re PNB Holding Company Shareholders Litigation*, where Chief Justice Strine, writing as a Vice Chancellor, considered after trial whether a group of individuals holding 33.5% of the company's outstanding shares constituted a control group for purposes of deciding whether to

---

[226] *Id.* at *24 (internal quotations and citations omitted).

[227] *See, e.g., Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 659-61 (Del. Ch. 2013).

[228] *See, e.g., In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3030808, at *5 (Del. Ch. June 18, 2018) (finding that "[p]laintiffs have stated a reasonably conceivable claim that the Merger should be considered under the entire fairness standard of review because it was a conflicted transaction involving [a control group]"); *Frank v. Elgamal*, 2014 WL 957550, at *18-19 (Del. Ch. Mar. 10, 2014) (finding that a group of stockholders did not constitute a control group during the initial part of a sales process but that a genuine issue of fact existed as to whether they did later in the sales process); *Zimmerman v. Crothall*, 62 A.3d 676, 700 (Del. Ch. 2013) (finding after trial that two stockholders did not constitute a control group for purposes of resolving a loyalty claim); *Emerson Radio Corp. v. Int'l Jensen Inc.*, 1996 WL 483086, at *17 (Del. Ch. Aug. 20, 1996) (finding on a preliminary injunction record that two stockholders did not constitute a control group for purposes of determining the probability of success of a fiduciary duty claim).

review a merger under the entire fairness standard of review.[229]  In holding that they did not, the court emphasized the lack of any voting agreement or other arrangement impeding each stockholder's ability to act in his or her own self-interest:

> All told, some twenty people (directors, officers, spouses, children, and parents) comprise the supposed controlling stockholder group.  The record, though, does not support the proposition that these various director-stockholders and their family members were involved in a blood pact to act together.  *To that point, there are no voting agreements between directors or family member[s].  Rather, it appears that each had the right to, and every incentive to, act in his or her own self-interest as a stockholder.*[230]

Here, plaintiffs have identified no case—and the court is aware of none—where the analysis for determining the existence of a control group has been applied to glom on to a preexisting controlling stockholder additional stockholders to give them the status of a "control group" for *Gentile* purposes or otherwise.  Given that the controller already is the proverbial 800-pound gorilla imbued with fiduciary obligations to guard against acting "selfishly to the detriment of the corporation's minority stockholders,"[231] it is not readily apparent why this scenario would arise.  To be sure, one can envision a situation where a controller may have parallel interests

---

[229] 2006 WL 2403999, at *9-12 (Del. Ch. Aug. 18, 2006).

[230] *Id.* at *10 (emphasis added).

[231] *Nine Sys.*, 2014 WL 4383127, at *24.

with other stockholders in a given transaction, but that is insufficient to create a "control group."[232]

In my opinion, in order for a preexisting controlling stockholder to become part of a "control group" with other stockholders, the preexisting controlling stockholder would have to agree to share with other stockholders, or to impose limitations on, its own control power (such as through a voting agreement) for some perceived advantage as part of a legally significant relationship with the other stockholders. In other words, the preexisting controlling stockholder would have to agree to limit its ability to act in its own self-interest as a controller in some material way; otherwise the preexisting controlling stockholder would retain the ability to wield control by itself, and the power of control would not reside in the hands of a "group." Nothing of this nature exists in the trial record.

With respect to the Brands Grant and the Anti-Dilution Grants, for example, Glenhill entered no arrangements to share its majority voting control with any Windsong entity (in the case of the Brands Grant) or Edelman and McPhee (in the case of the Anti-Dilution Grants), or to otherwise limit its ability to act in its own self-interest as the Company's majority stockholder. Indeed, Glenhill received no equity or other form of payment in connection with either transaction and actually

---

[232] *Id.* (citing *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *6 (Del. Ch. June 5, 2006)).

64

stood on the opposite side of the negotiating table for both transactions, each of which *diluted* its ownership stake in DWR. Indicative of this misalignment of interest, the record reflects that the negotiations with Windsong Brands over the Brands Grant were vigorous and protracted, extending over an eighteen-month period and resulting in a deal in which Windsong Brands received a 1.5% interest in the Company after initially demanding a 10% interest.

With respect to the Windsong Note, the 2012 Stock Sale, and the extension of the Windsong Note in 2012, the record shows that Glenhill's interests were, *at most*, parallel to those of Sweedler (the principal behind Windsong Brands), Edelman, and McPhee. This is because they each held an interest in Windsong I, the entity holding the Windsong Note, and thus each had an apparent interest in procuring the Windsong Note (and extending it) on terms favorable to Windsong I. The same holds true concerning the 2012 Stock Sale, where the purchasers were the Glenhill Long Fund ($500,000), Windsong II, an entity affiliated with Sweedler ($500,000), Edelman ($400,000), and McPhee ($400,000). Critically, however, nothing in the record indicates that Glenhill entered into a voting agreement or any other arrangement imposing limitations on its control power that would have prevented Glenhill from acting in its own self-interest as DWR's controlling stockholder as a result of any of these transactions.

65

During post-trial argument, plaintiffs cited as evidence of a control group the fact that Glenhill entered into an LLC Agreement in connection with the Windsong Note, and a Stockholders Agreement in connection with the 2012 Financing.[233] As an initial matter, plaintiffs never discussed either of these agreements as evidence of a control group during post-trial briefing, thereby waiving the argument,[234] and made no real effort to explain during post-trial argument why entering into either of these agreements supports their control group theory. In any event, based on the court's own review of the terms of these agreements, neither supports plaintiffs' position.

Glenhill, Edelman, McPhee, Windsong DB, LLC (an entity affiliated with Sweedler), and Jamieson Investments, LLC entered into the LLC Agreement in connection with Windsong I's issuance of the Windsong Note to DWR.[235] From the court's review, no provision in that agreement limited in any way Glenhill's ability to vote any of its shares in the Company as it saw fit so as to prevent it from acting unilaterally in its self-interest as DWR's majority stockholder. Rather, that agreement appears to address the rights and obligations relating to the members'

---

[233] Tr. 99 (May 1, 2018); Tr. 195-96 (May 22, 2018).

[234] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[235] JX 107.

respective ownership interests in Windsong I and the terms governing the internal affairs of that entity.[236]

Glenhill, Edelman, McPhee, and various Windsong entities entered into the Stockholders Agreement for the purpose of setting forth "certain terms and conditions regarding the [2012 Stock Sale] and the ownership of the Equity Securities held by the Stockholders, including certain restrictions on the transfer of such shares."[237]  As with the LLC Agreement, the court found no provision in that agreement evidencing that Glenhill limited in any way its ability to vote its shares in the Company as it saw fit.  The Stockholders Agreement does contain a provision providing that, subject to various exceptions, "no Stockholder shall Transfer, directly or indirectly, all or any part of its Equity Securities . . . in the Company without the prior approval of the board of directors of the Company,"[238] but that provision did not limit Glenhill's ability to vote its shares in the Company and exercise its majority voting control as it sees fit, including by replacing the members of the Board, or to otherwise act unilaterally in its self-interest as DWR's majority stockholder.

---

[236] *See* JX 107 at GH_WS0036423.

[237] Tr. 195-196 (May 22, 2018); JX 246 at DWR_EM_0002220.

[238] JX 246 at DWR_EM_0002222 § 2.1.

In sum, based on the preponderance of the evidence, I find that Glenhill alone was DWR's controlling stockholder at all times from the 2009 Transaction until the Merger, and that it did not share or otherwise limit its control power with any Windsong entity, Edelman, or McPhee in such a manner as to make them part of a "control group" along with Glenhill for purposes of applying the *Gentile* framework.

## B. The Transactions Underlying the Overpayment Claims Did Not Result in an Improper Transfer of Either Economic or Voting Power from the Minority Stockholders to Glenhill

The harm *Gentile* seeks to remedy arises "when a controlling stockholder, with sufficient power to manipulate the corporate processes, engineers a dilutive transaction whereby that stockholder receives an exclusive benefit of increased equity ownership and voting power for inadequate consideration."[239] As such, a transaction does not fit within the *Gentile* paradigm if the controller itself is diluted by that transaction.[240] Having determined that Glenhill alone was DWR's controlling stockholder at all relevant times, the next question is whether any of the challenged transactions resulted "in an improper transfer of both economic

---

[239] *Feldman v. Cutaia*, 956 A.2d 644, 657 (Del. Ch. 2007), *aff'd*, 951 A.2d 727 (Del. 2008).

[240] *See Dubroff v. Wren Holdings, LLC*, 2011 WL 5137175, at *9 (Del. Ch. Oct. 28, 2011) ("[M]inority shareholders may have a direct equity dilution claim when their holdings are diluted, and those of the corporation's controller are not. In other words, as long as the controller's holdings are not decreased, and the holdings of the minority shareholders are, the latter may have a direct equity dilution claim.").

value *and* voting power from the minority stockholders" to Glenhill.[241] The answer is clearly no.

As an initial matter, the parties debate whether the type of securities underlying most of the Overpayment Claims—*i.e.*, a convertible debt instrument, stock options, or restricted stock that vests only on a change-of-control—can form the basis of an improper transfer of economic and voting power under *Gentile*.[242] I need not resolve these technical issues. Even if one assumes for the sake of argument that each of these types of securities could satisfy *Gentile*, which is debatable,[243] none of the transactions challenged here resulted in a disproportionate transfer of economic and voting power to Glenhill.

As a mathematical matter, for a transaction to transfer economic and voting power to Glenhill disproportionately, Glenhill would need to receive in that transaction a percentage of the security to be issued that *exceeds* the percentage of economic and voting power Glenhill already held in the Company immediately

---

[241] *El Paso*, 152 A.3d at 1263 (emphasis in original).

[242] Glenhill's Answering Br. at 51-53; Pls' Reply Br. at 26-27.

[243] *See, e.g., ACP Master*, 2017 WL 3421142, at *26 (concluding that plaintiff did not have standing to assert a direct dilution claim after a merger because "Sprint's notes were never converted and no additional shares were issued"); *Caspian Select Credit Master Fund Ltd. v. Gohl*, 2015 WL 5718592, at *5 (Del. Ch. Sept. 28, 2015) (rejecting plaintiffs' attempt to characterize a term loan facility, which was "facially a debt instrument," as an equity transaction for purposes of *Gentile*); *Harff v. Kerkorian*, 324 A.2d 215, 219 (Del. Ch. 1974), *rev'd on other grounds*, 347 A.2d 133 (Del. 1975) ("The holder of an option to purchase stock is not an equitable stockholder of the corporation.").

before that transaction. Otherwise, the transaction either would be *dilutive* to Glenhill or would maintain its percentage ownership. A simple hypothetical demonstrates the point.

Assume that Glenhill had a pre-issuance equity stake of 90 of 100 shares outstanding, that the Windsong entities, Edelman, and McPhee collectively held five shares, and that the remaining stockholders held five shares. If the Company issued 50 shares in a transaction, Glenhill must receive 90% of those shares to retain its 90% stake in the post-issuance entity:

| Stockholder | Pre-Issuance Shares | Share Issuance | Post-Issuance Shares |
|---|---|---|---|
| Glenhill | 90 | 45 | 135 |
| Windsong/Edelman/McPhee | 5 | 5 | 10 |
| Public Minority | 5 | 0 | 5 |
| Total | 100 | 50 | 150 |
| Glenhill Stake | 90% | 90% | 90% |

Now assume that, as part of that 50 share issuance, Glenhill received only ten shares (20% of the issuance) while the Windsong entities, Edelman, and McPhee together received the remaining 40 shares (80% of the issuance). In that scenario, Glenhill's position would drop below 90%:

70

| Stockholder | Pre-Issuance Shares | Share Issuance | Post-Issuance Shares |
|---|---|---|---|
| Glenhill | 90 | 10 | 100 |
| Windsong/Edelman/McPhee | 5 | 40 | 45 |
| Public Minority | 5 | 0 | 5 |
| **Total** | **100** | **50** | **150** |
| | | | |
| **Glenhill Stake** | **90%** | **20%** | **67%** |

Glenhill did not receive any securities in connection with either the Brands Grant or the Anti-Dilution Grants. Thus, by definition, both of these transactions were *dilutive* to Glenhill and fail to satisfy the second prong of *Gentile*.

Although Glenhill received a 20% economic interest in the Windsong Note and purchased approximately 28% of the shares issued in connection with the 2012 Stock Sale, both of these transactions also were *dilutive* to Glenhill and fail to satisfy the second prong of *Gentile* because Glenhill held at least a majority of the economic and voting power of the Company at all times from the 2009 Transaction until the Merger.[244] Plaintiffs do not contend otherwise, which explains why they premised their *Gentile* argument on a novel "control group" theory instead of focusing on Glenhill's own control position.

---

[244] According to plaintiffs' expert, Glenhill held approximately 85% of the Company on a fully diluted basis as of May 18, 2010, when the Windsong Note was issued. JX 513 Ex. E. The math concerning Glenhill's ownership interest before the 2012 Financing is more complicated, but it plainly exceeded a majority position. *See* JX 513 Ex. E (calculating Glenhill's position to be approximately 86% as of October 3, 2012); JX 552 at Defs' Demonstrative 2 (estimating Glenhill's position to be approximately 87% as of July 2012).

\* \* \* \* \*

For the reasons explained above, the Overpayment Claims (which seem to include at least Counts IV, VI, and VII) do not fall within the *Gentile* paradigm and thus constitute purely derivative claims that were extinguished by the Merger. Accordingly, judgment is entered in defendants' favor and against plaintiffs with respect to each of those claims.

In reaching this conclusion, I recognize that some of the claims that will be extinguished here involved self-dealing transactions in which all members of the Board were conflicted (*e.g.*, the Windsong Note and the 2012 Financing) and which otherwise would be subject to entire fairness review.[245] As the *El Paso* decision recently reinforced, however, our law only permits purely derivative claims to survive a merger in certain narrowly prescribed circumstances, which simply do not exist here.[246] And at least in this case, unlike in *El Paso*, plaintiffs cannot claim to

---

[245] Krevlin, Sweedler, Edelman, and McPhee all benefited from these transactions by receiving, personally or through affiliated entities, an interest in the Windsong Note or shares of stock or options issued in connection with the 2012 Stock Sale. In Krevlin's case, these benefits were obtained through his status as the largest holder of the Glenhill Long Fund at all relevant times. *See* Tr. 105-06 (Krevlin). That is the vehicle through which Glenhill acquired its 20% membership interest in Windsong I (the entity holding the Windsong Note) and purchased approximately 28% of the shares sold in the 2012 Stock Sale.

[246] *See Lewis*, 477 A.2d at 1047, n.10 ("The two recognized exceptions to the rule are: (1) where the merger itself is the subject of a claim of fraud; and (2) where the merger is in reality a reorganization which does not affect plaintiff's ownership of the business enterprise.").

72

have been ambushed.  They did not assert any of the Overpayment Claims in real time but chose to file them after the Merger closed, presumably aware of the risk of litigating derivative claims in that context.

## V.  ANALYSIS OF PLAINTIFFS' REMAINING CLAIMS

In this section, the court considers plaintiffs' remaining claims.  Each of these claims, which were litigated seemingly as an afterthought to the claims discussed in Sections III and IV above, relates to the Merger.  They are styled as claims for breach of fiduciary duty, equitable fraud, and aiding and abetting, and they concern essentially two subjects: the manner in which the Change of Control Bonuses were paid and certain disclosures in the Merger Notice.  Based on these theories, plaintiffs seek, among other relief, rescissory damages.

### A.  Change of Control Bonuses

As previously discussed, during due diligence for the Merger, DWR's counsel discovered that a greater number of options had been granted to twelve employees than was authorized under the Company's 2009 Equity Incentive Award Plan.  The Company addressed this problem by paying the affected employees Change of Control Bonuses in a cash equivalent to what they would have received had their options been exercised in connection with the Merger.  Edelman and McPhee together received approximately $2 million in Change of Control Bonuses.

73

Plaintiffs assert in Count X that the Board breached its fiduciary duty by having the Company pay the Change of Control Bonuses on the theory that it caused plaintiffs to bear a pro rata portion of the expense.[247] This claim fails for two related reasons.

First, the contractual obligation to pay the option holders plainly belonged to the *Company* as the counterparty to the stock option agreements with its employees.[248] That obligation was not owed by the Director Defendants or any subgroup of stockholders, and plaintiffs have offered no logical reason why the Company's directors would be under a fiduciary obligation to treat the options as anything other than a liability of the Company.

Second, plaintiffs have not established any harm resulting from the Company paying the Change of Control Bonuses. As plaintiffs concede, the Company selected a zero-sum solution where the option holders received exactly the same value they would have received had the options been valid.[249] Thus, the Change of Control Bonuses did not reduce the Merger consideration the plaintiffs received. If anything,

---

[247] Pls.' Opening Br. at 72-73. Count X also was asserted against the Glenhill Defendants (Compl. ¶¶ 190-91), but plaintiffs did not brief and thus waived that aspect of the claim. *See Emerald P'rs*, 726 A.2d at 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[248] *See* JX 394 at DWR_EM_0006761, 6765, 6769, 6773; *see also* JX 411 (flow of funds memorandum).

[249] Pls.' Opening Br. at 72 ("After discovering that DWR had awarded more options than authorized under its option plan, the Board decided to pay the holders of invalid options the value they would have received in the Merger had the options been valid.").

the solution was beneficial to the Company (and all of its stockholders) because it eliminated—for no cost—the risk of employees seeking to impede the closing of the Merger to enforce their contractual rights.[250]

## B.    The Merger Notice

Plaintiffs assert two claims predicated on alleged material misstatements or omissions in the Merger Notice that principally concern the background of the Merger and the circumstances concerning the Change of Control Bonuses:[251] breach of fiduciary duty (Count IX) and equitable fraud (Count XII).  I address each in turn.

### 1.    Fiduciary Duty of Disclosure

"[D]irectors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action."[252]  "[T]he duty of disclosure is not an independent duty, but derives from the duties of care and loyalty."[253]  To recover damages for a breach of this nature, plaintiffs bear the burden of proving:  "(i) a culpable state of mind or

---

[250] *See* Tr. 500-01 (Edelman).

[251] *See* Pls.' Opening Br. at 81-82.

[252] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

[253] *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (internal quotations and citations omitted).

75

non-exculpated gross negligence, (ii) reliance by the stockholders on the information that was not disclosed, and (iii) damages proximately caused by that failure."[254]

At the times relevant to this action, DWR's certificate of incorporation contained a provision, authorized under 8 *Del. C.* § 102(b)(7), exculpating DWR's directors from monetary liability for breaches of the duty of care.[255] Thus, the Director Defendants only could be liable with respect to the Merger Notice if they breached their duty of loyalty.[256] Here, however, plaintiffs have not identified any evidence of disloyalty or bad faith precipitating the contents of the Merger Notice. Indeed, plaintiffs made no effort in their post-trial briefs to discuss Glenhill's or the directors' involvement in the Merger Notice's preparation or approval, or how they were responsible for the contents of any of the alleged misstatements or omissions.[257]

Plaintiffs' fiduciary duty claim concerning the Merger Notice also fails because plaintiffs have not adduced any evidence of damages proximately caused by the alleged misstatements or omissions in the Merger Notice. "When seeking post-closing damages for breach of the duty of disclosure, . . . plaintiffs must prove

---

[254] *In re Wayport Inc. Litig.*, 76 A.2d 296, 315 (Del. Ch. 2013) (citing *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 146-47 (Del. 1997)).

[255] JX 1 at GH/WS 1392 (Ninth Article).

[256] *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 360-63 (Del. Ch. 2008), *as revised* (June 24, 2008).

[257] *See Emerald P'rs*, 726 A.2d at 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

quantifiable damages that are 'logically and reasonably related to the harm or injury for which compensation is being awarded.'"[258] Plaintiffs have not made such a showing here, nor could they.

The sole question the Merger Notice presented to plaintiffs was whether to accept the Merger consideration or to demand appraisal. Here, however, as Almond and Franklin both testified,[259] plaintiffs have never contended—even after full discovery and the retention of experts—that the Merger consideration was unfair. Plaintiffs did not even present an expert to offer an opinion on that subject. Instead, plaintiffs' consistent strategy throughout this case has been to advance arguments to obtain a larger share of the Merger consideration. They employed this strategy by, among other things, opposing the relief sought under Section 205 to correct the double dilution problem and pressing the purely derivative Overpayment Claims despite their lack of standing to do so. Plaintiffs' failure to challenge the sufficiency of the Merger consideration is fatal to their claim for damages relating to the Merger Notice.

---

[258] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 53 (Del. Ch. 2014) (quoting *In re J.P. Morgan Chase & Co. S'holder Litig.,* 906 A.2d 766, 775 (Del. 2006)).

[259] Tr. 1192 (Franklin); JX 497 at 264 (Almond Dep.). Given plaintiffs' admissions that the Merger consideration was fair and the manner in which plaintiffs consistently litigated this case, I do not credit Franklin's testimony—in response to a leading question from his own counsel—that he would have sought appraisal "if the Merger Notice disclosed everything [he] now know[s] about DWR." Tr. 1110 (Franklin).

## 2. Equitable Fraud

To recover on a claim for equitable fraud, plaintiffs must establish "1) a false representation, usually of fact, by defendant; 2) an intent to induce plaintiff to act or to refrain from acting; 3) that plaintiff's action or inaction was taken in justifiable reliance upon the representation; and 4) damage to plaintiff as a result of such reliance."[260] Plaintiffs' equitable fraud claim in Count XII is based on the same alleged misstatements and omissions in the Merger Notice as their breach of fiduciary duty claim discussed above. As with that claim, plaintiffs' equitable fraud claim fails because it is conceded that the Merger consideration was fair. Thus, plaintiffs have not, and cannot, establish damages based on any alleged reliance on the contents of the Merger Notice.

## C. Aiding and Abetting

Plaintiffs assert in Count XI that Herman Miller aided and abetted breaches of fiduciary duty by the Director Defendants and the Glenhill Defendants with respect to (i) the Change of Control Bonuses (Count X); and (ii) the Merger Notice (Count IX).[261] Under Delaware law, to prove a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must establish: "(i) the existence of a fiduciary

---

[260] *Shamrock Hldgs. of Cal., Inc. v. Iger*, 2005 WL 1377490, at *7 (Del. Ch. June 6, 2005) (citations omitted).

[261] Pls.' Opening Br. at 82-83.

78

relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach."[262]

Because plaintiffs have failed to establish a predicate breach of fiduciary duty with respect to the Change of Control Bonuses and the Merger Notice, or any harm resulting therefrom, the aiding and abetting claim against Herman Miller fails for the reasons discussed above.[263] Additionally, plaintiffs have failed to prove that Herman Miller knowingly participated in any wrongdoing.

"Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach."[264] In other words, the aider and abettor must act with *scienter*, meaning that "the aider and abettor must act knowingly, intentionally, or with reckless indifference that is, with an illicit state of mind. To establish *scienter,* the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper."[265]

Plaintiffs have not proven that Herman Miller acted with scienter concerning either the Change of Control Bonuses or the Merger Notice. With respect to the

---

[262] *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015).

[263] *See, e.g. In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *27 (Del. Ch. Oct. 24, 2014) ("Because the underlying breaches of fiduciary duty are being dismissed, Plaintiffs' aiding and abetting claim must be dismissed as well.").

[264] *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001).

[265] *RBC*, 129 A.3d at 862 (internal quotations and citations omitted).

79

Change of Control Bonuses, plaintiffs have not presented any evidence suggesting that anyone at Herman Miller knew that its conduct was "legally improper." It is unsurprising that such evidence does not exist, given that having the Company—as the counterparty to the employees' option agreements—pay the Change of Control Bonuses was an objectively reasonable solution. With respect to the Merger Notice, plaintiffs have not identified any evidence suggesting that Herman Miller actually knew that the Merger Notice contained any of the alleged false or misleading statements or omissions.

## D. Rescissory Damages

Finally, plaintiffs contend in Count I that they are entitled to rescissory damages on the theory that the Merger was tainted by defendants' breaches of fiduciary duty with respect to the Change of Control Bonuses and the Merger Notice, and Herman Miller's aiding and abetting of the same.[266]

Rescissory damages are "the monetary equivalent of rescission"[267] and are "an exception to the normal out-of-pocket measure" of compensatory damages.[268] "An

---

[266] Plaintiffs also argue they are entitled to rescissory damages because the Merger was not lawfully effected as a short-form merger under 8 *Del. C.* § 253, on the theory that Herman Miller held fewer than 90% of DWR's shares at the time of the Merger due to the defective corporate acts identified in the Ratification Resolutions. This argument fails given the court's validation of those acts under Section 205.

[267] *Lynch v. Vickers Energy Corp.,* 429 A.2d 497, 501 (Del.1981), *overruled in part on other grounds, Weinberger v. UOP, Inc.,* 457 A.2d 701, 714 (Del. 1983).

[268] *Strassburger v. Earley*, 752 A.2d 557, 579 (Del. Ch. 2000), *as revised* (Jan. 27, 2000).

award of rescissory damages is one form of relief that could be imposed if [a] merger is found not to be entirely fair *and* if one or more of the defendants are found to have violated their fiduciary duty of loyalty."[269]  "Any award of rescissory damages only would be imposed on those fiduciaries who committed a loyalty breach."[270]  Given that plaintiffs do not challenge the fairness of the Merger and have not proven a breach of the fiduciary duty of loyalty, no basis exists to entertain plaintiffs' request for rescissory damages.

## VI.   CONCLUSION

For the reasons explained above, judgment is entered in defendants' favor and against plaintiffs on all claims in this case, *i.e.*, Counts I-XII of the Complaint and the counterclaim.  The parties are directed to confer and submit an implementing order within ten business days.  If plaintiffs intend to seek an award of attorneys' fees with respect to the court's granting of relief under Section 205, the form of order should include a schedule for briefing that issue.

---

[269] *In re Orchard Enter., Inc. S'holder Litig.*, 88 A.3d 1, 41 (Del. Ch. 2014).

[270] *Id.  See also Strassburger*, 752 A.2d at 578 ("Rescissory damages must approximate as closely as possible the financial equivalent of rescission, and may be recovered only for a breach of the duty of loyalty."); *Transkaryotic Therapies*, 954 A.2d at 360 ("[W]here a breach of the disclosure duty does not implicate bad faith or self-interest, both legal and equitable monetary remedies (such as rescissory damages) are barred on account of the exculpatory provision authorized by 8 *Del. C.* § 102(b)(7)."); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1144 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995) ("[R]escissory damages should never be awarded against a corporate director as a remedy for breach of his duty of care alone; that remedy may be appropriate where a breach of the directors duty of loyalty has been found.").